## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

————————————————— x

BLACK MOUNTAIN EQUITIES, INC.,   :

  :

        Plaintiff,   :

v.   :   Civil Action No. 2:12-cv-01285(ES)(CLW)

  :

PACIFIC GOLD CORP.,   :

  :

        Defendant.   :

————————————————— x

---

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

---

**GREENBERG TRAURIG LLP**
200 Park Avenue, P.O. Box 677
Florham Park, NJ 07932-0677
(973) 360-7900
Attorneys for Defendant
Pacific Gold Corp.

Of Counsel and On the Brief:

    Roger B. Kaplan, Esq. (RK 6985)
    Jason Kislin, Esq.

Date: May 7, 2012

# TABLE OF CONTENTS

**Section**                                                                 **Page**

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................... 3

ARGUMENT

I.      PLAINTIFF HAS A HIGH BURDEN IN SEEKING
        *AFFIRMATIVE* PRELIMINARY INJUNCTIVE RELIEF
        THAT IS NOT NEEDED TO PREVENT IRREPARABLE
        HARM, ALTERS THE *STATUS QUO ANTE*, IS ENTIRELY
        UNNECESSARY TO PROTECT PLAINTIFF'S ABILITY
        TO OBTAIN FINAL RELIEF IF SUCCESSFUL, AND WILL
        CAUSE IRREPARABLE HARM TO DEFENDANT AND
        ITS EIGHT THOUSAND SHAREHOLDERS ..................................................14

II.     PLAINTIFF CANNOT DEMONSTRATE A
        LIKELIHOOD OF SUCCESS ON THE MERITS .............................................16

III.    PLAINTIFF CANNOT DEMONSTRATE THAT,
        WITHOUT THE REQUESTED RELIEF, IT WILL
        SUFFER IRREPARABLE HARM........................................................................19

        A.      Even If Plaintiff Was Entitled To Equitable Relief,
                It Is Not Entitled To An Injunction Tantamount To
                The Final Relief Sought .........................................................................19

        B.      Plaintiff Is Not Entitled To Final Equitable Relief And,
                Thus, Is Not Entitled To Any Preliminary Injunction To
                Preserve A Final Equitable Remedy .....................................................20

        C.      Plaintiff Cannot Obtain Preliminary Injunctive Relief
                In Aid Of A Damage Claim Even Where A Defendant
                Is Insolvent............................................................................................23

        D.      Plaintiffs' Cases Awarding Stock Are Under A Warrant
                Are Inapposite........................................................................................26

IV.     THE BALANCE OF HARDSHIPS AND EQUITIES
        DECIDEDLY FAVORS DEFENDANT ..............................................................28

V.      IF ANY RELIEF IS GRANTED TO PLAINTIFF, PLAINTIFF
        SHOULD BE REQUIRED TO POST AN ADEQUATE BOND, IN THE
        AMOUNT OF $1.2 MILLION, TO SECURE DEFENDANT'S DAMAGES IN
        IMPROPERLY OBTAINING PRELIMINARY RELIEF ....................................29

CONCLUSION..........................................................................................................30

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                    <u>**Page**</u>

*Acierno v. New Castle County,*
   40 F.3d 645 (3d. Cir. 1994)........................................................................ 15

*Alpha Capital Aktiengesellschaft v. Advanced Viral Research Group,*
   02-cv-2219, 2003 WL 328302 (S.D.N.Y. February 11, 2003).................. 28

*Alpha Capital Aktiengesellschaft v. Advanced Viral Research Group,*
   03-cv-51, 22003 WL 328302 (S.D.N.Y. February 11, 2003)................... 27

*Alpha Capital Anstalt v. Advanced Cell Technology, Inc.,*
   09-CV-670 (S.D.N.Y. Feb. 10, 2009)....................................................... 26

*Alpha Capital Anstalt v. Advanced Cell Technology,*
   11-cv-6458 (S.D.N.Y. Oct. 14, 2011 ........................................................ 26

*Bayer v. Airlift Int'l, Inc.,*
   111 N.J. Super. 461 (Ch. Div. 1970) ................................................... 21, 22

*Black Mountain Equities, Inc. v. Advanced Cell Technology, Inc.,*
   11-CV-7305 (S.D.N.Y. Nov. 10, 2011) .................................................25-26

*Broadwater v. Old Republic Surety,*
   854 P.2d 527 (Utah 1993).......................................................................... 22

*Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.,*
   482 F.Supp.2d 1065 (E.D. Wis. 2007)...................................................... 29

*Castle Creek Technology Partners, LLC v. Cellpoint, Inc.,*
   02-cv-6662, 2002 WL 31958696 (S.D. N.Y. Dec. 9, 2002)...................... 27

*Celeste Trust Reg. v. Greystone Digital Technology, Inc.,*
   01-CV-91 (S.D.N.Y. Jan. 12, 2001) ......................................................... 26

*Cumberland County Improvement Auth. v. GSP Recycling Co., Inc.,*
   358 N.J.Super. 484, 818 A.2d 431 (2003) ............................................... 18

*Diaz v. DeMane,*
   2007 WL 4570331 (D.N.J. Dec. 26, 2007)............................................... 24

*Dimock v. U.S. Nat. Bank,*
   55 N.J.L. 296 (E&A 1893).................................................................... 21, 22

*Fleischer v. James Drug Stores,*
   1 N.J. 138 (1948) ...................................................................................... 20

*Frank's GMC Truck Center, Inc. v. General Motors Corp.,*
   847 F.2d 100 (3d Cir. 1988)...................................................................... 29

*Galigher v. Jones,*
   129 U.S. 193 (1889)................................................................................... 21

*Gerardi v. Pelullo,*
    16 F. Supp. 2d 1363 (3d Cir. 1994) ........................................................... 24

*Gladstone v. Waldron & Co.,*
    1998 WL 150982 (S.D.N.Y. March 31, 1998) ........................................... 25

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999) .......................................................................... passim

*Hardy ex rel. Dowdell v. Abdul-Matin,*
    198 N.J. 95, 965 A.2d 1165 (2009) .......................................................... 18

*Heckler v. Redbud Hosp. Dist.,*
    473 U.S. 1308 (1985) ............................................................................... 20

*Hoxworth v. Blinder, Robinson & Co., Inc.,*
    903 F.2d 186 (3d Cir. 1990) .................................................................... 25

*Kaplan v. Cavicchia,*
    107 N.J. Super. 201 (App. Div. 1969) ..................................................... 22

*Kos Pharms., Inc. v. Andrx Corp.,*
    369 F.3d 700  (3d Cir. 2004) .................................................................... 29

*Longview Special Finance, Inc. v. Infinium Labs, Inc.,*
    06-cv-1772 (S.D. N.Y. Nov. 29, 2006) ..................................................... 27

*Markham v. Jaudon,*
    41 N.Y. 235 (1882) .................................................................................. 21

*Martindell v. Fiduciary Counsel,*
    133 N.J. Eq. 408 (E. & A. 1943) .............................................................. 20

*Mead Johnson & Co. v. Abbott Labs.,*
    201 F.3d 883 (7th Cir. 2000) ................................................................... 29

*Nissen v. Rozsa,*
    2009 WL 2391244 (D.N.J. Aug. 4, 2009) ................................................ 25

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,*
    389 F.3d 973 (10th Cir. 2004) ................................................................. 15

*Paine v. Jersey Cent. Power & Light Co.,*
    12 N.J. Misc. 739 (1934) ......................................................................... 21

*Siegel v. Riverside Box and Lumber Co.,*
    89 N.J.L. 595 (E & A. 1916) .................................................................... 21

*Simon v. Electrospace Corp.,*
    269 N.E.2d 21 (1971) .............................................................................. 22

*State Troopers Fraternal Ass'n of N.J. v. State,*
    149 N.J. 38, 692 A.2d 519 (1997) ........................................................... 18

*Travelers Indem. Co. v. Dammann & Co, Inc.*,
   594 F.3d 238 (3d Cir. 2010)..................................................................... 18

*U.S. v. Spectro Foods Corporation*,
   544 F.2d 1175 (3d Cir. 1976)................................................................... 15

*Univ. Of Texas v. Walter*,
   451 U.S. 390 (1981)................................................................................ 20

*Warner Bros. Pictures v. Gittone*,
   110 F.2d 292 (3d Cir. 1940)............................................................. 15, 17

*Winters v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008)............................................................................ 14, 19

*Zambelli Fireworks Manufacturing Co., Inc., v. Wood*,
   592 F.3d 412 (3d Cir. 2010)..................................................................... 29

## PRELIMINARY STATEMENT

Defendant Pacific Gold Corp. (PGC) submits this Memorandum of Law and the accompanying Certifications of Robert Landau ("Landau Cert."), Andrew J. Hudders, Esq. ("Hudders Cert.") and Roger B. Kaplan, Esq. ("Kaplan Cert.") in opposition to the motion filed by plaintiff Black Mountain Equities, Inc. ("BME") for preliminary injunctive relief

As demonstrated by the accompanying certifications, not only does plaintiff *fail to* show any likelihood, or even possibility, of success on the merits, the facts show that plaintiff's claims are entirely *meritless*. Indeed, the facts show that plaintiff *knew* that its claims had no merit even before it acquired the Warrant at issue in this case, because it was specifically told that the Warrant could not be exercised and had no value by its predecessor in interest, YA Global Investments (YAG"). Rather than attempt to exercise the Warrant itself -- because it *knew* that it could not do so -- YAG sold the Warrant to plaintiff on February 14, 2012, less than two weeks before the February 26, 2012 expiration date, *for only $2,575* (representing a mere .58% of the $445,000 that plaintiff claims the Warrant is worth). Indeed, before selling the Warrant YAG determined, *for itself*, that there was *no price adjustment* under the Warrant to $0.0099 (as alleged by plaintiff) or any other price. Thus, prior to selling the Warrant, YAG's agent and Investment Manager performing the sale for YA (Yorkville Advisors) reviewed YAG's rights and the adjustment provisions under the Warrant, and specifically told plaintiff in an email that the "**adjustment mechanism in the warrants is not applicable**" (Kaplan Cert. Ex. D)(emphasis added). And, when Yorkville had told plaintiff to expect PGC to fight, plaintiff's response was "**Trust me I know they will!!! I have been to this dance before**" (*Id.*)(emphasis added).

Further demonstrating that YAG and BME *knew* that the Warrant was not exercisable, the Warrant Purchase Agreement between BME and YAG contains no representation by YAG

that the Warrant could be exercised at *any* price. To the contrary, YAG specifically *deleted* the representation in the Warrant Purchase Agreement in the first WHEREAS clause, that the Warrant was "exercisable for 6,000,000 shares of common stock of Pacific Gold Corporation" (*Id.* at Ex. C). Thus, plaintiff -- and its predecessor -- knew that its claims in this case were entirely false. Indeed, the evidence further demonstrates that the sole purpose of acquiring the Warrant and filing this litigation was to seek to create leverage against PGC -- to, essentially, *extort* PGC -- to force it to settle *solely* to avoid the litigation costs in defending this frivolous and vexatious litigation.

Plaintiff also cannot show any irreparable harm because: (a) under New Jersey law, plaintiff is not entitled to the shares or specific performance of the Warrant, but, rather, its sole remedy is a claim for damages consisting of the value of the shares at the time of exercise; (b) even if plaintiff were entitled to specific performance, defendant has already reserved the necessary shares to issue to plaintiff in the unlikely event that plaintiff could prevail on the merits; and (c) as a matter of law, a plaintiff cannot obtain preliminary injunctive relief to secure a claim for damages even where the defendant is insolvent, which is not the case here.

Finally, defendant demonstrates below that the balance of hardships in this case tips decidedly -- overwhelmingly -- in defendant's favor because the immediate issuance of 44.5 million shares to plaintiff, representing 5% of plaintiff's outstanding shares, would immediately have a disastrous effect on the price of the outstanding shares of defendant's stock held by more than 8,000 shareholders; and would, as a result, severely cripple defendant's ability to borrow.

## STATEMENT OF FACTS

The Warrant at issue in this case (the "YAG Warrant") was issued to plaintiff's predecessor in interest, YA Global Investments LLC ("YAG") (formerly "Cornell Capital Partners LP"). Under the terms of the Warrant, YAG could exercise an option to obtain shares of PGC prior to February 26, 2012, at the stated exercise price of $0.216 per share, which was ultimately reduced to $0.18 per share. *See* Landau Cert., Ex. A and E. If, however, the price of PGC shares was below the exercise price, YAG's option was 'out of the money' and could not be exercised. *Id.*, Ex. A. YAG obtained a significant amount of PGC shares at prices per share ranging from $0.0052 to $0.18 by way of a Convertible Debenture issued at the same time that the YAG Warrant was issued. *Id.*, Ex. B.

Section 8 of the YAG Warrant provided for an exercise price adjustment upon the issuance of certain PGC securities, but *exempted* any adjustment for "Excluded Securities":

> Section 8.    Adjustment of Warrant Exercise Price and Number of Shares. **Except with respect to Excluded Securities** or the issuance thereof, but only **prior to the date that all of the Debentures [simultaneously issued to YAG on February 26, 2007] have been redeemed by payment thereof or converted into shares of Common Stock of the Company [PGC]**, the Warrant Exercise Price and the number of shares of Common Stock issuable upon exercise of this Warrant shall be adjusted from time to time as follows:
>
> (a) Adjustment of Warrant Exercise Price and Number of Shares upon Issuance of Common Stock. If and whenever the Company issues or sells, or is deemed to have issued or sold, any shares of Common Stock **(other than Excluded Securities)** for a consideration per share less than a price (the "Applicable Price") equal to the Warrant Exercise Price in effect immediately prior to such issuance or sale, then immediately after such issue or sale the Warrant Exercise Price then in effect shall be reduced to an amount equal to such consideration per share. Upon each such adjustment of the Warrant Exercise Price hereunder, the number of Warrant Shares issuable upon exercise of this Warrant shall be adjusted to the number of shares determined by multiplying the Warrant Exercise Price in effect immediately prior to such adjustment by the number of Warrant Shares issuable upon exercise of this Warrant immediately

3

prior to such adjustment and dividing the product thereof by the Warrant Exercise
Price resulting from such adjustment. (YAG Warrant §8)(emphasis added).

*Id.* Ex. A.  Under Section 1(b)(vi), "Excluded Securities" were defined as follows:

> (vi) "Excluded Securities" means, (a) shares issued or deemed to
> have been issued by the Company pursuant to an Approved Stock Plan, (b) shares
> of Common Stock issued or deemed to be issued by the Company upon the
> conversion, exchange or exercise of any right, option, obligation or security
> outstanding on the date prior to date of the Securities Purchase Agreement,
> provided that the terms of such right, option, obligation or security are not
> amended or otherwise modified on or after the date of the Securities Purchase
> Agreement . . . (c) shares issued in connection with any acquisition by the
> Company, whether through an acquisition of stock or a merger of any business,
> assets or technologies, leasing arrangement or any other transaction the primary
> purpose of which is not to raise equity capital, (d) the shares of Common Stock
> issued or deemed to be issued by the Company upon conversion of the Debenture
> [simultaneously issued to YAG on February 26, 2007] and the Other Debentures
> and exercise of the Warrants, (e) debentures and warrants originally issued by the
> Company to Palisades Master Fund and Crescent International, Ltd., and (f)
> securities issued pursuant to Purchase Rights. (YAG Warrant §1(b)(vi))(emphasis
> added). (*Id.*)

Attached to the Landau Cert. as Exhibit B is complete listing of all shares issued by PGC

during the period that the YAG Debenture was outstanding, *i.e.*, between February 26, 2007, and

September 4, 2009.  As set forth in Exhibit B to the Landau Cert., each and every issuance of

shares during this period involved securities that YAG agreed were "Excluded Securities" and,

thus, exempt from the price adjustment in Section 8 of the YAG Warrant.

Plaintiff's central contention is that, because Crescent International exercised its

conversion rights at $0.0099 per share under the Crescent Debenture of October 5, 2007, YAG

had the right to the same exercise price under the YAG Warrant pursuant to Section 8(a) of the

Warrant.  However, plaintiff's predecessor, YAG, *knew* that the adjustment of the Crescent

conversion price to $0.0099 per share under the Crescent Debenture was the *direct result* of

YAG's *own* exercise of its conversion rights under the YAG Debenture occurring within ten

months of the Crescent Debenture original issue date, as specifically provided for in Paragraph 5(c) of the Crescent Debenture. *Id.* at ¶8.[1]

The issuance of shares to Crescent under Section 5(c) of the Crescent Debenture was specifically agreed to by plaintiff's predecessor, YAG, as being "Excluded Securities" under the YAG Warrant and, therefore, *exempt*. As set forth in detail in the Hudders Cert., simultaneously with the issuance of the October 5, 2007 Crescent Debenture, PGC also entered into a letter agreement with YAG dated October 5, 2007 (the "YAG Letter Agreement"). In that Letter Agreement, YAG not only consented to the Crescent Debenture (after specifically negotiating and agreeing to Section 5(c) of the Crescent Debenture), but also agreed that *any* securities issued under the terms of the Crescent Debenture, *if not changed*, would be "Excluded

---

[1] Paragraph 5(c) of the Crescent Debenture provided:

        c)   <u>Adjustment for Cornell [YAG] Financing</u>. If at the earlier of (i) the 10 month anniversary of the Original Issue Date and (ii) the repayment, in full, of the debt pursuant to the Cornell Financing, the Company [PGC] has issued shares of Common Stock to Cornell in connection with any redemption pursuant to the Cornell Financing (the "<u>Cornell Redemption Shares</u>") and the average price of the three last redemption issuance of the Cornell Redemption Shares (the "<u>Cornell Redemption Price</u>") prior to the Cornell Adjustment Date (as defined below) is lower than the then Conversion Price [under this, the Crescent, Debenture], then, upon the earlier of (a) the 10 month anniversary of the Original Issue Date and (b) the repayment, in full, of the debt pursuant to the Cornell Financing (such earlier date, the "<u>Cornell Adjustment Date</u>"), the then Conversion Price shall be reduced to on a one time basis equal the Cornell Redemption Price; <u>provided, however</u>, if the Cornell defers any redemption issuance of Cornell Redemption Shares, the Cornell Adjustment Date will be extended by one month for each such deferred issuance; <u>provided, further, however</u>, the Cornell Adjustment Date will not be extended by more than three months, in the aggregate.

    Thus, the conversion price under the Crescent Debenture was adjusted down, to 0.0099, pursuant to Paragraph 5(c) of the Crescent Debenture based upon the average conversion price, under the YAG Debenture, of the conversions by YAG for the three last redemption issuances to YAG during the ten month period following date of the Crescent Debenture, which were as follows:

| Date | Transaction ID | Shares Issued | Issued To | Price |
|------|----------------|---------------|-----------|-------|
| July-03-08 | Issued TR# 74366 | 4,999,991 | YAG | 0.0098 |
| Aug-06-08 | Issued TR# 74938 | 5,981,683 | YAG | 0.0101 |
| Aug-19-08 | Issued TR# 75150 | 6,273,146 | YAG | 0.0098 |

    Pursuant to Paragraph 5(c) of the Crescent Debenture, the conversion price under the Crescent Debenture was reset to the average of these prices, or reset to $0.0099. Landau Cert., Exhibit C. This adjustment of the Crescent Debenture conversion price was the *sole* adjustment of the conversion price under the Crescent Debenture and, therefore, occurred on a one time basis consistent with the terms of Section 5(c) of the Crescent Debenture.

Securities" under the YAG Warrant.   Thus, in the YAG Letter Agreement, the parties specifically agreed as follows:

> (a)     YAG consented to the issuance of the Debenture to Crescent International with a stated conversion price of $0.18 per share and certain adjustments as set forth by the terms of the Crescent Debenture;

> (b)     The parties agreed that the stated Crescent conversion price of $0.18 per share would adjust YAG's exercise price under the YAG Debenture and Warrant to $0.18 per share;

> (c)     The parties agreed in Paragraph 5 of the Letter Agreement that, "<u>for purposes of the YA Global Warrant, the definition of 'Excluded Securities' [includes] the issuance of shares of Common Stock on conversion of the Crescent Debenture and exercise of the Crescent Warrant <i>upon the terms as originally issued on the date hereof provided the terms are not changed after the date hereof</i></u>" (emphasis added); and,

> (d)     The parties agreed in Paragraph 9 that, with respect to any <i>other</i> adjustment of the Crescent conversion price -- <i>i.e.,</i> not "upon the terms as originally issued on the date hereof provided the terms are not changed after the date hereof" under Paragraph 5 -- then YAG would get the same exercise price under the YAG Warrant.

There was no change or amendment to the Crescent Debenture. Landau Cert., ¶7. Indeed, plaintiff and plaintiff's predecessor in interest, YAG, knew this because no such amendment or modification was ever disclosed or included in any SEC filing by PGC. *Id.* And, plaintiff specifically knew of the YAG Letter Agreement because the YAG Letter Agreement was provided to plaintiff by YAG and had been included in PGC's publicly available SEC filings. *Id.*

Moreover, YAG was provided with the Crescent Debenture in connection with entering into the YAG Letter Agreement.  Indeed, the Crescent Debenture could not have been issued without the consent of YAG, and YAG participated in the negotiation and drafting of the

Crescent Debenture. See Hudders Cert, ¶12 and Ex. F.  Thus, YAG knew of such conversions by Crescent at the time, and knew at the time that such conversions were *exempt* under Section 8 of the YAG Warrant. Indeed, over the next three years, YAG never once contended that any of conversions by Crescent at $0.0099 resulted in any adjustment of the exercise price under the YAG Warrant -- or sought to exercise the YAG Warrant at that price.  Landau Cert., ¶11.

Finally, the contemporaneous emails between PGC's attorney and YAG's attorney, during the period October 1-5, 2007, leading to the Crescent Debenture and the YAG Letter Agreement, directly demonstrate that, at the time, YAG: (i) was specifically aware of Paragraph 5(c) of the Crescent Debenture; (ii) had negotiated and demanded changes to Paragraph 5(c) of the Crescent Debenture understanding that YAG's own redemptions under its Debenture would cause the conversion price under the Crescent Debenture to be reduced to the average of the three last redemptions by YAG during the 10-month period following the original Crescent issuance date; (iii) understood that Paragraph 5 of the YAG Letter Agreement was intended specifically to address conversions by Crescent under and pursuant to Section 5(c) of the Crescent Debenture because, among other reasons, the only way that Crescent could obtain an adjusted lower price under Section 5(c) was if YAG obtained a lower price under the YAG Debenture within ten months after the Crescent Debenture; and (iv) understood that  Paragraph 9 of the YAG Letter Agreement applied to any *other* adjustment of the Crescent conversion price not "upon the terms as originally issued on the date hereof provided the terms are not changed after the date hereof" as per Paragraph 5. (Hudders Cert. ¶8 and Exhs. F-K).  Thus, the contemporaneous emails and drafts establish the following:

- The very first draft of Paragraph 5 of YAG Letter Agreement reviewed by YAG's counsel, David Fine, Esq., specifically provided:

7

> 5. The Company and Cornell agree that for purposed of Section 1(b)(vi) of the Cornell Warrant, the definition of "Excluded Securities" will include hereafter the shares of Common Stock of the Company issued or to be issued on conversion of the Crescent Debenture and exercise of the Crescent Warrant upon the terms as originally issued on the date hereof.

(Hudders Cert., Ex. L).

• In an October 3, 2007, email, YAG's counsel, David Fine, attached his redlined comments to the letter agreement which contained the following underlined changes to Paragraph 5 of the letter agreement:

> 5. The Company and <u>YA Global</u> agree that for purposed of Section 1(b)(vi) of the <u>YA Global</u> Warrant, the definition of "Excluded Securities" will include hereafter the shares of Common Stock of the Company issued or to be issued on conversion of the Crescent Debenture and exercise of the Crescent Warrant upon the terms as originally issued on the date hereof <u>provided the terms are not changed after the date hereof.</u>

(Hudders Cert., Ex. G).

• In an October 4, 2007, email, YAG's counsel, David Fine, provided specific comments with regard to Sections 5(b) and 5(c) of the Crescent Debenture, as well as the Crescent Securities Purchase Agreement and Crescent Warrant, and provided further comments with regard to paragraphs 3 and 5 of the letter agreement expressing concern that PGC might, in the future, provide Crescent with some additional adjustment that YAG might not get, stating that "I think it is fair that we both be treated the same going forward." (Hudders Cert., Ex. H).

• This email was followed with additional emails on October 4, 2007, in which: (i) PGC's attorney, Andrew Hudders, asked YAG's attorney, David Fine, for YAG to "decide on the 10-13 month question" with respect to Section 5(c) of the Crescent Debenture; and (ii) David Fine, for YAG, again revised the YAG Letter Agreement by inserting a new Paragraph 9 specifically to address Fine's (YAG's) concern that PGC might, *in the future*, provide Crescent with some adjustment that YAG might not get, stating that "I think it is fair that we both be treated the same going forward." Thus, the new Paragraph 9, with David Fine's underlined additions, provided:

> 9. For purposes of this agreement, if the Crescent Debenture rate <u>or the Crescent Warrant exercise price</u> is <u>adjusted then the exercise price of the</u>

8

> YA Global Warrant and the warrant issued on February 26, 2007 to YA Global on assignment from Palisades Master Fund shall each be adjusted pursuant to Section 8 and section 3(b), respectively, and the fixed conversion price of the YA Global Debenture, if it is not paid in full, will be adjusted pursuant to Section 5(a) of the YA Global Debenture to the extent such adjustment is below the exercise or conversion price of the YA Global Debenture or Warrant.

(Hudders Cert., Ex. I).

This was, in fact, the final version of Paragraph 9 of the YAG Letter Agreement. Id. ¶ 13.

It is thus *clear* -- from the face of the final YAG Letter Agreement, as well as the emails and YAG's own revisions leading up to the final letter agreement -- that Paragraph 5 of the YAG Letter Agreement dealt specifically with, and *excluded*, shares issued under the Crescent Debenture "upon the terms as originally issued on the date hereof provided the terms are not changed after the date hereof" which expressly encompasses the adjustment under the *unchanged* terms of Section 5(c) of the Crescent Debenture reducing the Crescent conversion price to $0.0099. *Id.*, ¶14. Indeed, *in the same emails* YAG's attorney specifically focused on and provided comments regarding Paragraph 5 of the Letter *and* Section 5(c) of the Crescent Debenture. Conversely, Paragraph 9 encompasses any *new* adjustment provided by PGC to Crescent -- *i.e.*, *not* based "upon the terms as originally issued on the date hereof provided the terms are not changed after the date hereof" -- to address YAG's (David Fine's) concern in his October 4, 2007 email that, with respect to any such *new* adjustment, "I think it is fair that we both be treated the same going forward." *Id.*, ¶ 15.  Reading Paragraph 5 and 9 of the YAG Letter Agreement together, as well as the contemporaneous emails, it is clear that Paragraph 5 *exempted* as "Excluded Securities" shares issued to Crescent under Paragraph 5(c) of the Crescent Debenture "upon the terms as originally issued on the date hereof provided the terms are not changed," and that Paragraph 9 covered any newly granted adjustments to the Crescent

9

conversion price. *Id.*, ¶ 16

In addition, because conversions by YAG, itself, under the YAG Debenture were, from the beginning, specifically "Excluded Securities" under Section 1(b)(vi)(d) of the YAG Warrant and exempt from Section 8 of the YAG Warrant, it would have been *incongruous* -- and would have entirely defeated the definition of "Excluded Securities" under Section 1(b)(vi)(d) of the YAG Warrant -- if a lower conversion price under the YAG Debenture could cause a lower conversion price under Paragraph 5(c) of the Crescent Debenture which, in turn, would cause a lower price under the YAG Warrant *Id.*, ¶ 17. Thus, the clear intent of Paragraph 5 of the YAG Letter Agreement was, as stated, "for purposes of the YA Global Warrant, the definition of 'Excluded Securities' [includes] the issuance of shares of Common Stock on conversion of the Crescent Debenture and exercise of the Crescent Warrant *upon the terms as originally issued on the date hereof provided the terms are not changed after the date hereof*" *Id.* and Ex. E.

On February 14, 2012, BME purchased the Warrant from YAG. (Complaint ¶7). The Warrant Purchase Agreement and the circumstances surrounding that transaction demonstrate that both parties -- YAG and BME -- knew that the YAG Warrant was not exercisable and knew that the positions now advanced by BME were without basis. Indeed, YAG sold the YAG Warrant to BME for a mere $2,575, which was an infinitesimal fraction (.57%) of what plaintiff claims the Warrant to be worth. Kaplan Cert., ¶ 3 and Ex. B. Indeed, BME sought to hide this fact by specifically *redacting* the purchase price for the Warrant when it first provided the Warrant Purchase Agreement to PGC with the exercise documents. Kaplan Cert., Ex. A.

YAG knew that it could not exercise the YAG Warrant at a $0.0099 exercise price, *i.e.*, that Crescent's adjusted price under Paragraph 5(c) of its Debenture was *exempt* under Paragraph 5 of the YAG Letter Agreement (Landau Cert., ¶ 11 -12). Indeed, YAG knew of Crescent's

10

conversions and share prices referenced as early as 2009 yet, for the next three years, failed to assert or rely on them for *any* adjustment of the exercise price of the YAG Warrant. *Id.* If YAG believed the YAG Warrant could be exercised at the price being claimed by plaintiff in the Complaint, it would make no economic sense for YAG to sell the Warrant at such a deep discount. Landau Cert., ¶13.   Instead, YAG could have, *itself*, exercised the Warrant and obtained the full value of the shares.

Rather than attempt to exercise the YAG Warrant itself -- because it *knew* that it could not, YAG sold the YAG Warrant to plaintiff BME less than two weeks before the February 26, 2012 expiration date of the Warrant. Kaplan Cert., ¶ 3-4. YAG sold the YAG Warrant at an extraordinarily discounted price -- a *mere* $2,575 -- that, plainly, did not reflect the value of the Warrant if, in fact, it could be exercised with a price of $0.0099 as alleged by plaintiff. *Id.*

Further demonstrating that YAG and BME *knew* the YAG Warrant was not exercisable, the Warrant Purchase Agreement between YAG and BME contains no representation by YAG that the Warrant could be exercised *at all*, or exercised at *any* price. *Id.*, ¶ 4.  To the contrary, YAG specifically *deleted* the representation in the first WHEREAS clause of the Warrant Purchase Agreement that the Warrant was "exercisable for 6,000,000 shares of common stock of Pacific Gold Corporation" *Id.*, ¶ 5 and Ex. C.

Finally, the emails produced by plaintiff show that BME was *specifically told by YAG prior to acquiring the Warrant* that the Warrant could not be exercised and was, essentially, worthless. *Id.*, ¶ 6.  Thus, the emails show that, a few hours prior to the closing of the Warrant Purchase Agreement between BME and YAG, Troy Rillo of Yorkville Advisors (YAG's Investment Manager and executing the sale of the Warrant to BME) told Adam Baker (President of BME) that YAG first needed "to evaluate the warrant" before agreeing to sell BME the

11

Warrant, in order for YAG to determine if the Warrant was "in the money", in which case YAG, itself, would "exercise" the Warrant. *Id.*, Ex. D. Then, a few hours later, after his review of the YAG Warrant, YAG's adjustment rights, the Crescent Debenture and the YAG Letter Agreement, Rillo advised Baker that the "**adjustment mechanism in the warrants is not applicable**." (*Id.*)(emph. add.).

Moreover, Mr. Rillo had informed plaintiff that "**the company [PGC] will give you (and us) a hard time on exercise.**" (*Id.*, Ex. E). (emph. add).  Undeterred and, apparently, already planning to use the Warrant and this lawsuit as *leverage* to force a settlement from PGC -- Baker responded: "**Trust me I know they will!!!  I have been to this dance before.**" *Id.*  Thus, YAG *knew* that the Warrant could not be exercised at the price being claimed by plaintiff and told BME that it could not. BME has nevertheless advanced the factually unsupportable and frivolous allegations in the Complaint. Indeed, pursuing its 'game plan,' immediately after filing the Complaint BME's President repeatedly sent emails to PGC saying it should settle to avoid the litigation costs in defending this baseless action. Landau Cert., ¶14  and Exh. G.

The *present* issuance of the disputed shares is entirely unnecessary to prevent any irreparable harm to plaintiff.  Plaintiff does not need the 44.5 million shares it is claiming to be actually issued in order to protect its interest, or to make sure the shares are available in the highly unlikely event that it prevails in this case. Landau Cert., ¶ 15.  Indeed, PGC currently has 5 billion shares authorized of which approximately 850 million shares are issued and outstanding.  *Id.*  Thus, merely "reserving" 44.5 million shares in plaintiff's name with PGC's stock transfer agent is enough to maintain the *status quo*.  *Id.*  This would absolutely guaranty that the shares were there, and available to be immediately issued to plaintiff if plaintiff prevails in this case and such a remedy were available -- which it is not. Moreover, plaintiff's claim

regarding PGC's potential insolvency is disingenuous at best, as it fails to account for PGC's entire financial picture, a financial picture which plaintiff was most definitely aware of when it purchased the YAG Warrants. *Id.* at ¶ 19.

The 44.5 million shares of stock that plaintiff seeks represent approximately 5% of all of the currently issued and outstanding shares of PGC stock, which is held by the more than eight thousand shareholders of PGC. *Id.* at ¶ 16. Immediately issuing 44.5 million new shares of stock, *even if placed in escrow*, would immediately have to be reported by PGC in an SEC filing, and would immediately cause a 5% dilution in all of the stock held by defendant's eight thousand plus other shareholders. *Id.* Indeed, whenever a significant number of shares (only 3-5 million shares) has been issued by PGC in the past, this has had an *immediate* downward effect on the market price of the shares above and beyond the simple mathematical dilutive effect. *Id.* at ¶ 17. These effects have been felt whenever PGC has issued even several million shares to YAG (only one-tenth the number of shares being demanded by plaintiff). *Id.* The issuance of such an *unprecedented* large block of shares, pursuant to a court order, would be perceived very negatively in the market and among PGC's shareholders and will, in all likelihood, cause a substantial dumping of PGC's stock, resulting in a very large decline in PGC's market value and market capitalization. *Id.* This will not only affect the market value and capitalization of PGC's stock but, because PGC's ability to obtain financing is directly tied to the market value and capitalization of its stock, this will directly, and very negatively, affect PGC's ability to obtain financing and operating capital. *Id.*[2]

---

[2]   PGC currently has approximately 850 million shares outstanding, held by over eight thousand shareholders, and the stock has been trading at around $0.015 per share. *Id.* Thus, the current market capitalization of PGC's outstanding stock is approximately $12 million, and issuing an additional 44.5 million shares would have a dilutive effect of 5%, or approximately $600,000. *Id.* However, because the market impact and sell-off of PGC stock will exceed the purely 5% arithmetic dilution effect, and will cause a significant sell-off, causing a huge drop in the

While plaintiff claims to be concerned about the solvency of PGC, forcing the issuance of the shares plaintiff now seeks will not do anything to protect the value of PGC. *Id.*, ¶ 18. In any event, plaintiff's analysis of PGC's solvency is overly simplistic and completely misplaced. *Id.*, ¶ 19. The balance sheet of PGC, like most mining companies, reflects only the *historical* cost of assets *less* depreciation. *Id.* Therefore, the asset values reflected on PGC's balance sheet do not reflect the true, current, fair market value of PGC's mining assets, which exceeds the company's liabilities. *Id.* Indeed, just recently, PGC executed an option/sale agreement for one of its mining properties for a value of $3 million. *Id.* Thus, neither PGC's balance sheet, nor the auditor's letter, which is primarily based on a review of the balance sheet, set forth a complete or accurate picture of PGC's financial condition. *Id.*

## ARGUMENT

**I.**     **PLAINTIFF HAS A HIGH BURDEN IN SEEKING *AFFIRMATIVE* PRELIMINARY INJUNCTIVE RELIEF THAT IS NOT NEEDED TO PREVENT IRREPARABLE HARM, ALTERS THE *STATUS QUO ANTE*, IS ENTIRELY UNNECESSARY TO PROTECT PLAINTIFF'S ABILITY TO OBTAIN FINAL RELIEF IF SUCCESSFUL, AND WILL CAUSE IRREPARABLE HARM TO DEFENDANT AND ITS EIGHT THOUSAND SHAREHOLDERS**

As most recently articulated by the Supreme Court in *Winters v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 22, 24 (2008):

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*        *        *

> [Preliminary] injunctive relief as an extraordinary remedy that may only be

---

market price, which will adversely affect PGC's ability to obtain financing because our ability to obtain financing is -- as shown by the Debentures with Crescent and YAG -- tied to our stock price. *Id.* Thus, the negative effect on PGC of the immediate issuance of 44.5 million shares under a court order would be *at least* twice the arithmetic dilution effect of issuing an additional 5% of the currently outstanding shares -- or as much as $1.2 million. *Id.*

awarded upon a clear showing that the plaintiff is entitled to such relief.

          \*          \*          \*

A preliminary injunction is an extraordinary remedy never awarded as of right.

Moreover, when -- as in this case -- plaintiff seeks *affirmative* preliminary injunctive relief that changes the *status quo ante*, the burden on plaintiff is significantly higher. Thus, affirmative preliminary injunctions are highly disfavored and should be sparingly exercised, if at all. *Warner Bros. Pictures v. Gittone*, 110 F.2d 292, 293 (3d Cir. 1940) (vacating an affirmative preliminary injunction, holding that "the effect of the preliminary injunction which the court granted was not to preserve the status quo but rather to alter the prior status of the parties fundamentally. Such an alteration may be directed *only after final hearing*, the office of a preliminary injunction being . . . merely to preserve *pendente lite* the last actual noncontested status which preceded the pending controversy"); *U.S. v. Spectro Foods Corporation,* 544 F.2d 1175, 1181 (3d Cir. 1976) ("The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised); *Acierno v. New Castle County,* 40 F.3d 645, 653 (3d. Cir. 1994) ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden"); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977-78 (10th Cir. 2004) (preliminary injunction that alters the status quo "operates outside the historic parameters for such interim relief [requiring plaintiff to] demonstrate a *substantial* likelihood of success on the merits" as opposed to a mere "likelihood of success"). Indeed, plaintiff is seeking to *dramatically* change the *status quo ante* by requiring defendant to issue 44.5 million new shares of stock, representing almost 5% of the all of defendant's outstanding stock, thereby immediately causing a 5% dilution in all of the stock held by defendant's eight thousand other shareholders.  BME is looking to achieve a *new* status. *See*

15

*Warner Bros. Pictures*, 110 F.2d at 293 ("Irreparable loss resulting from refusal to accord the plaintiff a new status . . . does not furnish the basis for interlocutory relief.").

As demonstrated below, plaintiff cannot satisfy *any* of the requirements for a preliminary injunction -- and, certainly, cannot satisfy this *heightened* standard. The evidence shows that it is *not* plaintiff, but rather, it is defendant who is will succeed on the merits. Next, plaintiff cannot establish any irreparable harm because, first, defendant has 5 billion shares authorized with 850 million shares issued, and defendant has already reserved 45 million shares for the possible issuance to plaintiff. Thus, preliminary relief is entirely *unnecessary* to insure that plaintiff will have a remedy at the end of the case in the event it prevails -- even *assuming* it would be entitled to specific performance. However, plaintiff is *not* entitled to specific performance because damages are the only remedy available to plaintiff under New Jersey law, and are easily calculated. Finally, the balance of hardships decidedly swings against plaintiff and in defendant's favor. The present issuance of the shares is entirely *unnecessary* to preserve a remedy for plaintiff. On the other hand, immediately issuing 44.5 million shares, even if placed in escrow, would  immediately have to be reported by defendant in an SEC filing, and would immediately cause a substantial price decline in the stock crippling defendant's borrowing capacity.

## II.    PLAINTIFF CANNOT DEMONSTRATE A <ins>LIKELIHOOD OF SUCCESS ON THE MERITS</ins>

Plaintiff's reading of the relevant agreements is tortured and flawed, and the only reasonable interpretation of the agreements could not lead to the absurd result now pressed by plaintiff -- as YAG itself recognized. The agreements at issue are the YAG Warrant, the Crescent Debenture and the YAG Letter Agreement.  The relevant portions of those agreements, and the negotiations leading to the Crescent Debenture and the YAG Letter Agreement, demonstrate that

16

the issuance of securities to Crescent at the price of $.0099 per share was agreed by YAG and PGC to be "Excluded Securities" under the YAG Warrant and, thus, would not operate to adjust the exercise price in the YAG Warrant.

Paragraph 5 of the YAG Letter Agreement provides: "for purposes of the YA Global Warrant, the definition of 'Excluded Securities' [includes] the issuance of shares of Common Stock on conversion of the Crescent Debenture and exercise of the Crescent Warrant <u>upon the terms as originally issued on the date hereof provided the terms are not changed after the date hereof</u>" (emphasis added).   The terms of the Crescent Debenture, which were never changed, provided for an exercise price of $0.18 and an adjustment to the exercise price to the extent that securities were issued to YAG pursuant to the YAG Debenture at prices below the Crescent Debenture exercise price, under Section 5(c) of the Crescent Debenture. Indeed, counsel for YAG participated in the negotiation of Section 5(c) of the Crescent Debenture at the same time he was negotiating Paragraph 5 of the YAG Letter Agreement which *excluded* the securities issued to Crescent under Section 5(c) so long as it was on "<u>the terms as originally issued on the date hereof provided the terms are not changed after the date hereof</u>." *Id.*   Moreover, the adjustment of the Crescent conversion price under Section 5(c) of its Debenture was triggered by YAG's conversion prices under its YAG Debenture, which are also "Excluded Securities" under Section 1(b)(vi)(d) of the YAG Warrant. Plainly, this is why YAG's Investment Manager told plaintiff that the "adjustment mechanism in the warrants is not applicable."

Plaintiff nevertheless contends that Paragraph 9 of the YAG Letter Agreement is the operative paragraph, which provides that "if the Crescent Debenture rate or the Crescent Warrant exercise price is adjusted then the exercise price of the YA Global Warrant . . . shall [be] adjusted pursuant to Section 8 . . . ." However, as demonstrated above, this paragraph was

17

specifically requested by YAG's counsel at a time when he had full knowledge of, and input into, the terms of the Crescent Debenture -- including Section 5(c) -- and was added by YAG's counsel  to ensure that YAG obtained the benefit of any *new* or *additional* adjustments provided to Crescent under its Debenture -- *i.e.*, provided not "upon the terms as originally issued on the date hereof provided the terms are not changed after the date hereof" as encompassed by Paragraph 5 of the Letter -- so that all both parties were "treated the same going forward."

Under New Jersey law, a court must "interpret the parties' contract according to its plain language…read[ing] the document *as a whole in a fair and common sense manner.*" *Travelers Indem. Co. v. Dammann & Co, Inc.*, 594 F.3d 238, 255 (3d Cir. 2010), citing  *State Troopers Fraternal Ass'n of N.J. v. State*, 149 N.J. 38, 692 A.2d 519, 523 (1997), and *Hardy ex rel. Dowdell v. Abdul–Matin*, 198 N.J. 95, 965 A.2d 1165, 1169 (2009). The Court must also "endeavor to avoid ignoring certain words or reading the contract in such a way as to make any words 'meaningless.'" *Travelers Indem. Co.*, 594 F.3d at 255 (quoting *Cumberland County Improvement Auth. v. GSP Recycling Co., Inc.*, 358 N.J.Super. 484, 818 A.2d 431, 438 (2003). It is plaintiff's interpretation; however, that will cause Paragraph 5 of the Letter Agreement to be meaningless and to cause a result contrary to common sense.

Indeed, if, as plaintiff requests, Paragraph 9 of the YAG Letter Agreement is read so as to create an adjustment in the YAG Warrant exercise price, than Paragraph 5 will be rendered entirely meaningless and superfluous.  More specifically, the language in Paragraph 5 identifying as Excluded Securities as "shares of Common Stock [issued] on conversion of the Crescent Debenture . . . upon the terms as originally issued on the date hereof provided the terms are not changed after the date hereof" was specifically requested by YAG's counsel in the negotiation of the Letter.  Moreover, because the one time adjustment given to Crescent under Section 5(c) of

18

the Crescent Debenture was the direct result of share prices received by YAG under its Debenture, this would also contradict Section 1(b)(vi)(d) of the YAG Warrant that excludes any adjustments for share prices issued to YAG.

Plaintiff's strained interpretation of the YAG Letter Agreement is flawed and renders Paragraph 5 superfluous. Defendant's reading of Paragraphs 5 and 9 of the YAG Letter Agreement is the only construction that honors *both* paragraphs and renders neither paragraph a nullity or superfluous. Indeed, YAG itself recognized this because it told plaintiff that the "adjustment mechanism in the warrants is not applicable" and asked plaintiff "Do you still want them?" stating that PGC "will give you (and us) a hard time on exercise." Undeterred, plaintiff responded with "Trust me I know they will!!! I have been to this dance before." BME then acquired the Warrant for a mere $2,575, instituted this litigation and immediately pursued its 'game plan' by seeking to force PGC to avoid the litigation costs that BME was threatening.

## III.   PLAINTIFF CANNOT DEMONSTRATE THAT, WITHOUT THE REQUESTED RELIEF, IT WILL SUFFER IRREPARABLE HARM

Demonstration of irreparable injury is the *sine qua non* for preliminary relief and is a mandatory requirement. As noted by the Supreme Court in *Winters*, *supra*:

> Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction. [citations omitted]. Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.  (*Id.* at 22).

The office of a preliminary injunction is *solely* to prevent irreparable harm that would prevent plaintiff from obtaining *equitable* relief at the end of the case. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 325 (1999). And equitable relief is unavailable if plaintiff has a legal damage remedy -- which, in this case, is its only remedy.

A. **Even If Plaintiff Was Entitled To Equitable Relief, It Is Not
   Entitled To An Injunction Tantamount To The Final Relief Sought**

Even if plaintiff were entitled to specific performance at the end of the case, plaintiff cannot establish any irreparable harm in this case. Defendant has 5 billion shares authorized with less than 850 million shares issued, and defendant has already reserved 44.5 million shares of its authorized shares for the possible issuance to plaintiff at the end of the case in the event that plaintiff prevails. What plaintiff asks for now is the *final* relief that it would be entitled to after a full and complete trial on the merits. Indeed, under plaintiff's logic, the plaintiff in a suit for specific performance to purchase land would be entitled to obtain a deed and title to the land, rather than just an order preventing the defendant from transferring or encumbering the land while the litigation went forward. Plaintiff's request for *final* relief by way of a preliminary injunction flies in the face of Supreme Court case law which holds that a preliminary injunction that is tantamount to a final judgment on the merits cannot be issued. *Univ. Of Texas v. Walter*, 451 U.S. 390, 395 (1981); *Heckler v. Redbud Hosp. Dist.*, 473 U.S. 1308, 1314 (1985).

B. **Plaintiff Is Not Entitled To Final Equitable Relief And, Thus, Is Not Entitled
   To Any Preliminary Injunction To Preserve A Final Equitable Remedy**

As for specific performance *versus* damages, the law in New Jersey is clear. As noted by the Supreme Court in *Fleischer v. James Drug Stores*, 1 N.J. 138, 166 (1948): "The right to the equitable remedy of specific performance turns upon the existence of an adequate remedy at law" and if "the remedy at law is adequate" specific performance is inappropriate. *See also Martindell v. Fiduciary Counsel*, 133 N.J. Eq. 408, 414 (E. & A. 1943) ("damages for the breach of the contract are normally ascertainable [and thus] there is no occasion for equitable relief."

The law in New Jersey is also clear that the *only* remedy for failure to deliver stock of a public company -- which, by definition, is *not* unique and is entirely fungible -- is damages based

20

upon the value of the shares at the time of the alleged breach (the failure to honor plaintiff's exercise of the Warrant) or the highest market price within a reasonable period of time thereafter. In *Dimock v. U.S. Nat. Bank*, 55 N.J.L. 296, 304-305 (E&A 1893), New Jersey adopted this rule that was articulated in *Markham v. Jaudon*, 41 N.Y. 235 (1882), and *Galigher v. Jones*, 129 U.S. 193 (1889). Thus, even in the case of *specific, identifiable securities owned by the plaintiff*, entrusted to the defendant and then converted by the defendant, plaintiff must either elect to replace the converted stock and recover the cost of replacement (damages), or recover the market price of the securities at the time of the conversion or the highest price within a reasonable period of time thereafter (damages). As the Court in *Dimock* noted, in such cases, the plaintiff can "require the [defendant] to replace the stock, and upon his failure so to do, the [plaintiff] may replace it himself and charge the [defendant]....[o]r the [plaintiff] may recover [the] market price from the time of the sale up to a reasonable time to replace the stock." *Id.* Subsequent to *Dimock*, the Court of Errors and Appeals of New Jersey again determined that the appropriate measure of damages was "the value [of the shares] at the time of the refusal to transfer" or within a reasonable period of time thereafter. *Siegel v. Riverside Box and Lumber Co.*, 89 N.J.L. 595, 596 (E & A. 1916). In *Paine v. Jersey Cent. Power & Light Co.*, 12 N.J. Misc. 739, 742 (1934), the court again held that the proper measure of damage was the value of the shares at the time the plaintiff first learned of the conversion, or within a reasonable time thereafter. In *Bayer v. Airlift Int'l, Inc.*, 111 N.J. Super. 461, 472-473 (Ch. Div. 1970), the Court once again applied the rule of damages first set forth in *Dimock*, noting that the rule is "based on what it would have cost the deprived owner to go into the market and purchase stock equivalent to that of which he had been deprived by the wrongful refusal to transfer." *Id.* at 472-473. This rational was explained further in *Bayer*, 111 N.J. Super. at 474, as follows:

> [I]t may be fairly assumed that a very large portion of the stocks purchased are purchased to be sold soon; and to give the purchaser, in case of a failure to deliver such stock, the right to elect their value at any time before trial, which might often be several years, would be giving him not indemnity merely but a power, in many instances, of unjust extortion.

Indeed, the Court in *Bayer* further noted:

> One conceivable argument against application of [this] rule in this case is that, perhaps, within a reasonable time after the conversion [plaintiff] might not have had the money to go out into the market and to purchase an equal [number of shares], an opportunity which the rule imputes to him. But his financial inability to make that purchase, if such were the fact, is not an element to be considered. In any event...it does not counterbalance other equitable considerations which support [the] rule  (*Id.*).[3]

Similarly, in *Simon v. Electrospace Corp.*, 269 N.E.2d 21, 26 (1971), the New York Court of Appeals noted that specific performance is never appropriate where the claim involves publicly traded stock. This reading of the case law is confirmed by the Supreme Court of Utah in *Broadwater v. Old Republic Surety*, 854 P.2d 527, 531, 532 (Utah 1993) which notes that the prevailing rule of damages,

> sets the measure of damages as the highest intermediate value of the stock between the time of conversion and a reasonable time after the owner receives notice of the conversion.... The [rule] indemnifies the owner of the converted stock for his or her loss, while requiring the owner to mitigate damages by replacing the stock within a reasonable time after notice of the conversion.... The

---

[3]   The only case in New Jersey that even suggests that a plaintiff could be entitled to an order requiring a defendant to deliver the stock, was in *Kaplan v. Cavicchia*, 107 N.J. Super. 201, 205 (App. Div. 1969), which involved *conversion* by defendant of specifically identifiable stock belonging to plaintiff and entrusted to defendant, in which the Court noted that the *legal remedy of replevin* -- for turnover the specific, identifiable shares of stock converted -- might be available to plaintiff. Thus, in *Kaplan*, 107 *N.J. Super.* at 205, the Appellate Division noted:

> Upon the conversion of securities the injured party has an election of remedies. He may sue at law in *replevin and obtain his securities*, if defendant still has them, plus damages for the wrongful detention. He may also sue at law for money damages in trover for the wrongful conversion. (*Id.*)(emphasis added).

This paragraph relates specifically to the legal remedy of *replevin* for *conversion* of *specific, identifiable securities* that had been *owned by plaintiff* and *entrusted to and held by defendant for plaintiff's account* -- not the present case. Moreover, this was pure *dicta*, and has never been cited or relied upon in any other case.

rule affords the owner of the stock a reasonable opportunity to consult counsel, employ other brokers, watch the market to determine when it would be advisable to purchase replacement stock, and raise funds should the owner decide to repurchase.

In sum, under *Dimock* and its progeny, even in the case of specifically identifiable stock already belonging to the plaintiff, plaintiff can ask (a) ask the defendant to deliver the stock and (b) upon defendant's failure so to do, plaintiff can replace it himself within a reasonable time and obtain damages in doing so, or (c) if the plaintiff fails to replace the stock within a reasonable time the aggrieved party's *sole* remedy is to recover the market price from the time of the conversion up to a reasonable time to replace the stock.

Thus, in the present case, damages are not only adequate and easily calculated, but are the *only* remedy available to plaintiff -- and plaintiff itself recognizes, in Count II of the Complaint, that it has a damage remedy based upon the value of the stock at the time of the attempted exercise of the Warrant.  Because damages are available and are the appropriate remedy, plaintiff is not entitled to injunctive relief and certainly not injunctive relief that would provide it with relief beyond that which it could obtain if it prevailed in the case.

C.    **Plaintiff Cannot Obtain Preliminary Injunctive Relief In Aid Of A Damage Claim Even Where A Defendant Is Insolvent**

As discussed above, plaintiff cannot obtain preliminary injunctive relief *in aid of* an *equitable* claim (such as specific performance) when the preliminary relief is the *final* relief sought.  The sole function of a preliminary injunction, in such circumstances, is to preserve the Court's ability to award final equitable relief should the plaintiff ultimately prevail.

Recognizing that it cannot justify the preliminary relief it seeks as being in aid of its *equitable* claim for relief, plaintiff switches tracks and attempts to justify its demand for a preliminary injunction as necessary to aid or preserve plaintiff's *damage* claim -- asserting that

23

defendant is insolvent and that a damage judgment may, ultimately, be uncollectible. However, this argument was directly rejected by the Supreme Court in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), in which plaintiff sought a preliminary injunction imposing, essentially, a pre-judgment attachment on defendant's assets in aid of and to preserve the damage claim against an insolvent holding company. The Court noted that,

> although a preliminary injunction 'was a reasonable measure to preserve the *status quo* pending final determination of [a claim] for equitable relief. . . . The preliminary relief available in a suit seeking equitable relief has nothing to do with the preliminary relief available in a creditor's bill seeking equitable assistance in the collection of a legal debt. (Id. at 325).[4]

Thus, the Supreme Court held that it was improper to grant *any* preliminary injunctive relief in order to preserve the collectability of a money damage claim. As the Court noted:

> We do not question the proposition that equity is flexible; but in the federal system, at least, that flexibility is confined within the broad boundaries of traditional equitable relief. [This] type of relief [] has never been available before [and] has been specifically disclaimed by longstanding judicial precedent. (Id. at 322).

The Supreme Court concluded that, "we hold that the District Court had no authority to issue a preliminary injunction . . . pending adjudication of [plaintiff's] claim for money damages." *Id.* at 333. Under the Supreme Court's decision in *Grupo*, plaintiff cannot justify or obtain *any* form of preliminary injunctive relief to aid or preserve a damage claim -- even where it is claimed that the defendant is insolvent, which is not the case.

All the cases relied on by plaintiff to support a preliminary injunction in aid of a damage remedy either *pre-date* the Supreme Court's decision in *Grupo*, or do not discuss or consider the *Grupo* decision at all. Thus, plaintiff cites to several cases from the Southern District of New York which are entirely inapposite for these reasons.

---

[4] *See, e.g. Diaz v. DeMane*, 2007 WL 4570331 at *4 (D.N.J. Dec. 26, 2007) (Linares, J.), quoting this portion of the *Grupo* decision, and in which the District Court noted that, under *Grupo* preliminary relief may granted on an equitable claim, but not on a claim for damages.

24

Within the Third Circuit, plaintiff cites *Gerardi v. Pelullo*, 16 F. Supp. 2d 1363, 1373 (3d Cir. 1994) -- decided before *Grupo* -- which simply prevented defendants from *dissipating* the proceeds of a settlement they obtained, and was imposed as a continuation of an *already existing injunction* and after partial summary judgment had been granted to plaintiffs. Plaintiff also cites *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186 (3d Cir. 1990) -- decided before *Grupo* -- in which discovery demonstrated that the defendant had been secreting and fraudulently moving and hiding assets in an effort to make it judgment proof, and the court simply prevented defendant from dissipating its assets.  Here, no such showing has been made by plaintiff -- nor could it be. There is no suggestion that PGC is secreting assets or doing anything else that would suggest it is trying to avoid the consequences of a judgment in this case.

Moreover, defendant is not insolvent. Defendant's balance sheet does not provide an accurate or complete picture of PGC's financial position, because it reflects only the *historical* cost of assets *less* depreciation. A true, fair market valuation of PGC's holdings would demonstrate that its assets well exceed its liabilities and that it is not in danger of closing its doors anytime soon.  And, even if PGC's solvency was relevant, which it is not, plaintiff has not set forth enough evidence to support its conclusion that PGC is, in fact, insolvent. *Nissen v. Rozsa*, 2009 WL 2391244 (D.N.J. Aug. 4, 2009)("mere speculation as to unsatisfiability of the judgment or potential dissipation of assets in the absence of any facts supporting such a claim is insufficient to meet its burden to demonstrate irreparable harm") *Gladstone v. Waldron & Co.*, 1998 WL 150982, *2 (S.D.N.Y. March 31, 1998) ("conclusory assertions of defendants' financial weakness do not demonstrate a likelihood of irreparable harm").

**D.   Plaintiffs' Cases Awarding Stock Are Under A Warrant Are Inapposite**

Plaintiffs rely on a few, unreported cases from the Southern District of New York in which the relief being sought by plaintiff in this case was awarded. Three of the cases -- *Black Mountain Equities, Inc. v. Advanced Cell Technology, Inc.*, 11-CV-7305 (S.D.N.Y. Nov. 10, 2011); *Alpha Capital Anstalt v. Advanced Cell Technology, Inc.*, 09-CV-670 (S.D.N.Y. Feb. 10, 2009); *Celeste Trust Reg. v. Greystone Digital Technology, Inc.*, 01-CV-91 (S.D.N.Y. Jan. 12, 2001) -- provide no analysis whatsoever on the issue of irreparable harm, or otherwise, and, therefore, are entirely uninformative. The remaining cases were all decided under New York law, not New Jersey law, and in each case the plaintiff had made a very substantial and overwhelming showing that it would succeed on the merits. To the contrary, in this case, defendant has shown that plaintiff has no chance of succeeding on the merits and that, under New Jersey law, plaintiff is not entitled to specific performance. Moreover, a number of the cases were decided before *Grupo*, and none of the cases even mention or discuss *Grupo*. As discussed below, the most significant distinction is that, in each case relied on by plaintiff, the Court found that the plaintiff had made a very *substantial* and, indeed, *overwhelming* showing that it would, in fact, succeed on the merits. Thus, plaintiff offers a handful of unreported SDNY decisions in which the plaintiff had made a *clear* and *substantial* showing that it would, in fact, prevail on the merits. Plaintiff does not provide the Court with the decisions that may have *rejected* the requested relief absent such a clear and substantial showing -- as is the case here.

In *Alpha Capital Anstalt v. Advanced Cell Technology*, 11-cv-6458 (S.D.N.Y. Oct. 14, 2011) the Court noted that plaintiff was "substantially likely to prevail on the merits [as] [t]he terms of the Warrants and Convertible Notes are clear and not in dispute." *Id.* at 5. The Court also found that defendant had "an accumulated deficit of $180,949,523" and that the agreement

26

at issue stipulated that specific performance would be the only adequate remedy for a breach. *Id.* (emphasis added). None of these circumstances exist in the present case.

In *Alpha Capital Anstalt v. Advanced Cell Technology*, 09-cv-670 (S.D.N.Y. Feb. 10, 2009) the Court noted that defendant raised only one argument in opposition to the issue of likelihood of success on the merits and that that argument had no merit. The Court concluded that "plaintiff is substantially certain to prevail on the merits in all respects...plaintiff in my view is substantially likely to prevail." *Id.* at 16. The Court did not engage in any analysis regarding the irreparable harm factor. The case is entirely inapposite to the facts presented here.

In *Longview Special Finance, Inc. v. Infinium Labs, Inc.*, 06-cv-1772 (S.D.N.Y. Nov. 29, 2006) there was no dispute over the meaning of the agreements at issue and the Court found that the "sketchy allegations and limited evidence [of misrepresentations made by plaintiffs] presented by [defendant] are insufficient to defeat [plaintiff's] *substantial showing* of likelihood of success on a breach of contract claim." *Id.* at 20 (emphasis added). The Court noted that the agreement between the parties stipulated that a breach would cause irreparable harm and that plaintiff was entitled to specific performance; and that, under New York law, "ordering compliance with the terms of a security contract is an appropriate form of relief." *Id.* at 21. Again, such factors simply do not exist in the present case.

In *Alpha Capital Aktiengesellschaft v. Advanced Viral Research Group*, 03-cv-51, 22003 WL 328302, *3-4 (S.D.N.Y. Feb. 11, 2003), again, there was no dispute regarding the interpretation of the agreements at issue. The Court also dismissed defendant's claim as meritless that plaintiff fraudulently induced defendant into entering into the agreements and that plaintiff itself had breached the agreements as being unsupported by the record before it. *Id.* Ultimately the Court found that "plaintiffs have shown a clear or substantial likelihood of success on the

merits." *Id.* Once again, the circumstances of the present case are entirely different.

In *Castle Creek Technology Partners, LLC* v. *Cellpoint, Inc.*, 02-cv-6662, 2002 WL 31958696 (S.D.N.Y. Dec. 9, 2002), the Court rejected defendant's principal argument that a term sheet that would have altered the conversion price of the plaintiffs' securities was binding. The Court dismissed defendant's other arguments, holding that plaintiff demonstrated a "substantial likelihood of success on the merits." Once, again, the present case is entirely different.

In *Alpha Capital Aktiengesellschaft v. Advanced Viral Research Group*, 02-cv-2219, 2003 WL 328302, *3-4 (S.D.N.Y. Feb. 11, 2003), the Court was faced with contractual terms which were "undisputable and indeed undisputed." *Id.* at *10. In fact, the Court noted that the defendants had "essentially acknowledged its obligations to 'live up to our contract' and introduced by way of defense only its thin showing of stock manipulation which tended primarily to affect the measure rather than the existence of liability." *Id.* The Court found that plaintiff demonstrated a "clear or substantial likelihood of success on the merits."

The plaintiff here -- *unlike* each and every plaintiff in the cases discussed above -- has failed to demonstrate *any* likelihood of success on the merits. Indeed, it is PGC that has shown that it will, in fact, prevail and that plaintiff's claims are entirely frivolous and without merit.

## IV. THE BALANCE OF HARDSHIPS AND EQUITIES DECIDEDLY FAVORS DEFENDANT

The balance of hardships decidedly swings against plaintiff and in defendant's favor. As noted above, the present issuance of the disputed shares is entirely unnecessary to preserve an equitable remedy for plaintiff, assuming plaintiff could establish its right to one. On the other hand, immediately issuing close to 44.5 million new shares of stock, even if placed in escrow, would immediately have to be reported by defendant in an SEC filing, and would immediately

28

cause irreparable hare to defendant PGC and its eight thousand shareholders.

**V.    IF ANY RELIEF IS GRANTED TO PLAINTIFF, PLAINTIFF SHOULD BE REQUIRED TO POST AN ADEQUATE BOND, IN THE AMOUNT OF $1.2 MILLION, TO SECURE DEFENDANT'S DAMAGES IN IMPROPERLY OBTAINING PRELIMINARY RELIEF**

While the "amount of a bond is left to the discretion of the court, the posting requirement is much less discretionary." *Zambelli Fireworks Manufacturing Co., Inc., v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010), citing *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988). Indeed, "[w]hile there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory." *Id.*

Here, plaintiff's contention that the bond is unnecessary because there is no risk to PGC is *untenable*. Should PGC be required to issue the shares now, as demanded by plaintiff as "preliminary relief", PGC's outstanding shares will immediately be diluted by 5%, the share price will plummet and plaintiff's ability to borrow will be entirely obstructed. The current market capitalization of PGC's outstanding stock is approximately $12 million, and issuing an additional 44.5 million shares, as requested by plaintiff, would have a dilutive effect of 5%, or approximately $600,000. However, the market impact and sell-off of PGC stock will exceed the purely 5% arithmetic dilution effect, and will cause a significant sell-off, causing a huge drop in the market price. Thus, the negative effect on PGC of the immediate issuance of 44.5 million shares under a court order would be at least twice the arithmetic dilution effect of issuing an additional 5% of the currently outstanding shares -- or as much as $1.2 million. Accordingly, should the Court determine that a preliminary injunction ordering the issuance of 44.5 million shares to BME is appropriate, the Court should require BME to post a bond in the amount of $1.2 million. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 732, n.28 (3d Cir. 2004) (District

Court should set "such bond as it determines to be appropriate to secure payment [of] any compensable money damages that it may incur prior to final disposition of this matter"); *Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.*, 482 F.Supp.2d 1065, 1078 (E.D. Wis. 2007) ("Because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, district courts should err on the high side when setting bond"), citing *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000).

## CONCLUSION

For all the foregoing reasons, plaintiff's motion for preliminary injunctive relief should be denied; or, if granted, plaintiff should post a bond in the amount of $1.2 million.

Date: May  7, 2012

**GREENBERG TRAURIG LLP**

BY: _____

Roger B. Kaplan, Esq.
Attorneys for Defendant Pacific Gold Corp.