Roger B. Kaplan, Esq.
GREENBERG TRAURIG LLP
200 Park Avenue, P. O. Box 677
Florham Park, NJ  07932
(973) 360-7900
Attorneys for Defendant/Counterclaim
Plaintiff Pacific Gold Corp.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

―――――――――――――――――――― x
BLACK MOUNTAIN EQUITIES, INC.,          :
                                        :
                    Plaintiff,          :
                                        :
    v.                                  :
                                        :   Civil Action No. 2:12-cv-01285(KM)(CLW)
PACIFIC GOLD CORP.,                     :
                                        :
                    Defendant..         :
―――――――――――――――――――― :
                                        x
PACIFIC GOLD CORP.,                     :
                                        :
                    Counterclaim        :
                    Plaintiff,          :
                                        :
    v.                                  :   **SECOND AMENDED COUNTERCLAIM**
                                        :
BLACK MOUNTAIN EQUITIES, INC.,          :
YA GLOBAL INVESTMENTS, L.P.,            :
YORKVILLE ADVISORS, LLC, TROY           :
RILLO, and ADAM BAKER,                  :
                                        :
                    Counterclaim        :
                    Defendants.         :
―――――――――――――――――――― x

Pacific Gold Corp. ("PGC"), by its undersigned attorneys, as and for its Amended Counterclaim against Black Mountain Equities, Inc. ("BME"), YA Global Investments, L.P. ("YAG"), Yorkville Advisors, LLC ("Yorkville"), Troy Rillo ("Rillo") and Adam Baker ("Baker"), hereby states and alleges as follows:

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction over this Counterclaim, pursuant to 28 U.S.C. §1332, in that there is complete diversity between the parties and the amount in

controversy exceeds the sum of $75,000, exclusive of interest and costs. This Court also has subject matter jurisdiction over this Counterclaim pursuant to 28 U.S.C. §1367.

2.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and because of forum selection clauses agreed to by the parties.

## PARTIES

3.     Pacific Gold Corp. ("PGC") is a corporation organized and existing under the laws of the State of Nevada with its principal place of business at 848 N. Rainbow Blvd. #2987, Las Vegas 89107.

4.     Black Mountain Equities, Inc. ("BME") is a corporation organized and existing under the laws of the State of California with its principal place of business located in San Diego, California 92129.

5.     YA Global Investments, L.P. ("YAG") (formerly known as "Cornell Capital Partners, L.P.") is, upon information and belief, either a Florida, Delaware or Cayman Islands limited partnership, whose partners are, upon information and belief, citizens of Florida and/or New Jersey, with its principal place of business located at 101 Hudson Street, Suite 3700, Jersey City, NJ 07302.

6.     Yorkville Advisors, LLC ("Yorkville") is, upon information and belief, a Delaware limited liability company whose members are, upon information and belief, citizens of Florida and/or New Jersey, with its principal place of business located at 11770 U.S. Highway One, Palm Beach Gardens, FL 33401. At all relevant times herein, Yorkville acted as the Investment Manager, Portfolio Manager and agent for YAG, and acted as such agent in New Jersey at the New Jersey office of YAG. Upon information and belief, Yorkville was also general partner of YAG.

7.     Upon information and belief, Troy Rillo, a citizen of the State of Florida with an

2

address and/or office located at 11770 U.S. Highway One, Palm Beach Gardens, FL 33401, is the Senior Managing Director for Yorkville Advisors.

8. Upon information and belief, Adam Baker, a citizen of the State of California with an address and/or office located at 13366 Greenstone Court, San Diego, California, 92131, is the President of Black Mountain Equities, Inc.

9. As set forth below, Rillo and Baker intentionally and willfully aided and abetted, and engaged in a conspiracy with the other counterclaim-defendants, for BME to file a meritless and frivolous lawsuit in the State of New Jersey, thereby intentionally and deliberately causing wrongful and unlawful conduct to occur in New Jersey. As a result, Rillo and Baker have intentionally and knowingly availed themselves of the privileges and protections of the State of New Jersey, thereby submitting themselves to in personam jurisdiction in New Jersey specifically with respect to this matter, consistent with due process and the traditional notions of fair play and substantial justice.

10. YAG, Yorkville, Rillo and Baker are joined as additional defendants on this Amended Counterclaim pursuant to Rules 13(h) and 20(a)(2) of the Federal Rules of Civil Procedure.

**FACTS**

**A. The YAG Securities Purchase Agreement, Convertible Debenture and Warrant, All Dated February 26, 2007**

11. PGC and YAG, through its Investment Manager, Portfolio Manager and agent, Yorkville, entered into a Securities Purchase Agreement dated February 26, 2007 (the "SPA") pursuant to which PGC issued a Convertible Debenture to YAG dated February 26, 2007 (the "YAG Debenture"), and also issued a Warrant to YAG to acquire additional shares of common stock of PGC, also dated February 26, 2007 (the "YAG Warrant").

12. Section 9(a) of the SPA, and the terms of the YAG Debenture and the YAG Warrant, specified that they would be governed by New Jersey law, and that each of the parties consented to jurisdiction and venue in the state or federal courts in New Jersey for the adjudication of any civil action relating to the SPA, the YAG Debenture and the YAG Warrant.

13. Among other things, between the issue date of February 26, 2007, and the maturity date of September 2, 2009, the YAG Debenture entitled YAG to obtain repayment of the Debenture through monthly installment conversions/redemptions of PGC stock based upon, *inter alia*, a conversion/redemption price equal to eighty percent (80%) of the average of the two (2) lowest volume weighted average prices of PGC's common stock during the ten (10) consecutive trading days immediately preceding the next installment date of the first of each month.

14. As a result, under this formula in the YAG Debenture, the *lower* the average of the two lowest volume weighted prices during the ten last trading days of each month, the *more* stock YAG would receive at the beginning of the next month under its conversion/redemption rights. It was, thus, in YAG's financial interests (*i.e.*, to increase the amount of stock it would receive) under the YAG Debenture for at least two trading days during the last ten trading days of each month to reflect low weighted average trading prices, and it was in YAG's financial interests intentionally to cause such lower prices to occur by intentionally timing the volume of its sale (*i.e.*, dumping shares) of millions of shares of PGC common stock, previously received under the YAG Debenture, during the last ten trading days of each month..

15. The YAG Warrant was exercisable at a stated price and upon terms set forth therein, including adjustment clauses and exclusions, and expired on February 26, 2012. The YAG Warrant could not be exercised if the market price of the shares of common stock of PGC was less than the YAG Warrant exercise price.

16. Section 8 of the YAG Warrant provided for an adjustment to the exercise price of the YAG Warrant, to a lower exercise price, based upon other securities that may issued by PCG at a lower price, but *excluded* any adjustment of the Warrant exercise price for the issuance by PGC of *"Excluded Securities"* -- as that term was defined by Section (1)(b)(vi) of the YAG Warrant or as agreed to by the parties.

      B.      **The Crescent Debenture Dated October 5, 2007**

17. On October 5, 2007, PGC issued a Debenture to Crescent International (the "Crescent Debenture"). The terms of the Crescent Debenture provided for a stated conversion price and adjustments to that price upon the occurrence of certain specified events, including the issuance of shares to YAG pursuant to the YAG Debenture at certain prices within a certain period of time.

18. Thus Section 5(c) of the Crescent Debenture provided:

> c) <u>Adjustment for Cornell [YAG] Financing</u>. If at the earlier of (i) the 10 month anniversary of the Original Issue Date and (ii) the repayment, in full, of the debt pursuant to the Cornell Financing, the Company [PGC] has issued shares of Common Stock to Cornell in connection with any redemption pursuant to the Cornell Financing (the "<u>Cornell Redemption Shares</u>") and the average price of the three last redemption issuance of the Cornell Redemption Shares (the "<u>Cornell Redemption Price</u>") prior to the Cornell Adjustment Date (as defined below) is lower than the then Conversion Price [under this, the Crescent, Debenture], then, upon the earlier of (a) the 10 month anniversary of the Original Issue Date and (b) the repayment, in full, of the debt pursuant to the Cornell Financing (such earlier date, the "<u>Cornell Adjustment Date</u>"), the then Conversion Price shall be reduced to on a one time basis equal the Cornell Redemption Price; <u>provided</u>, <u>however</u>, if the Cornell defers any redemption issuance of Cornell Redemption Shares, the Cornell Adjustment Date will be extended by one month for each such deferred issuance; <u>provided</u>, <u>further</u>, <u>however</u>, the Cornell Adjustment Date will not be extended by more than three months, in the aggregate.

19. YAG, through counsel, participated in the drafting of the Crescent Debenture, including the terms providing for adjustments to the exercise price and, specifically, Section 5(c),

5

of the Crescent Debenture which provided for a price adjustment based on issuances of PGC shares to YAG pursuant to the YAG Debenture.

### C. The YAG Letter Agreement Dated October 5, 2007, Consenting To The Crescent Debenture

20. In connection with the issuance of the Crescent Debenture, YAG (by and through its Investment Manager, Portfolio Manager and agent, Yorkville) and PGC entered into and executed a letter agreement dated October 5, 2007 (the "YAG Letter Agreement") whereby, among other things, YAG consented to the Crescent Debenture and the issuance of PGC shares to Crescent at $0.18 per share, upon the terms and conditions, *including adjustment provisions*, set forth in the Crescent Debenture, and, in return, YAG obtained a lower exercise price of $0.18 for the YAG Warrant.

21. The YAG Letter Agreement specifically stated that YAG (by and through its Investment Manager, Portfolio Manager and agent, Yorkville) consented to PGC's issuance of the Crescent Debenture "convertible into common stock of [PGC] at the rate of $.18, *subject to adjustment*" (emphasis added), and YAG specifically consented to -- indeed, had input in drafting -- Section 5(c) of the Crescent Debenture. Thus, Paragraph 5 of the YAG Letter Agreement provided, in pertinent part, that,

> for purposes of the YA Global Warrant, the definition of 'Excluded Securities' [includes] the issuance of shares of Common Stock on conversion of the Crescent Debenture and exercise of the Crescent Warrant *upon the terms as originally issued on the date hereof provided the terms are not changed after the date hereof* . . . . (YAG Letter Agreement, ¶5)(emphasis added).

22. The terms of the Crescent Debenture were never altered or changed.

### D. Adjustment of the Crescent Debenture Pursuant to Section 5(c)

23. On or about November 19, 2008, under and pursuant to the terms of Section 5(c) of the Crescent Debenture, PGC made a one time adjustment to the conversion price under the

6

Crescent Debenture to $0.099 per share, based on the issuance of shares to YAG pursuant to the YAG Debenture in July and August 2009, which price adjustment for Crescent was required by Section 5(c) of the Crescent Debenture and had been agreed to by YAG (by and through its Investment Manager, Portfolio Manager and agent, Yorkville) in ¶5 of the YAG Letter Agreement.

24. YAG and its Investment Manager and agent, Yorkville, were at the time aware of this adjustment to the Crescent Debenture conversion price to $0.0099. Nevertheless, for more than three years thereafter, YAG, and its Investment Manager, Portfolio Manager and agent, Yorkville, never claimed or sought any adjustment of the exercise price under the YAG Warrant based upon the adjusted price of $0.0099 under Section 5(c) of the Crescent Debenture; nor did they seek, at any time prior to the expiration of the YAG Warrant on February 26, 2012, to exercise the YAG Warrant by claiming any adjustment to the exercise price of the YAG Warrant as a result of issuance of shares to Crescent at $0.0099 per share.

### E. Sale of the YAG Warrant To BME For $2,575 on February 14, 2012

25. Twelve days before the expiration of the YAG Warrant, on February 14, 2012, BME purchased the YAG Warrant from YAG for a purchase price of $2,575 pursuant to a Warrant Purchase Agreement between BME as purchaser and YAG as seller (the "WPA") which was executed for YAG by its Investment Manager, Portfolio Manager and agent, Yorkville.

26. Immediately before selling the YAG Warrant to BME, on February 14, 2012, YAG's Investment Manager, Portfolio Manager and agent, Yorkville (which executed the WPA on behalf of YAG), reviewed the YAG Warrant, the YAG Letter Agreement, the Crescent Debenture, and other related documents, and determined that the adjustment mechanism in the YAG Warrant was not applicable and that the YAG Warrant was not exercisable.

27. As a result, prior to selling the Warrant to BME, Yorkville, through Rillo,

informed BME, through Baker, that the adjustment mechanism under the YAG Warrant was not applicable and that PGC would fight any attempted exercise of the Warrant by BME. BME, through Baker, recognized and acknowledged these facts, but stated to YAG and Yorkville that BME still wanted to purchase the Warrant anyway, with the specific intent of using the Warrant and the Complaint in this litigation to wrongfully pressure and coerce PGC to issue shares to BME solely to avoid the costs of defending against BME's meritless claims, and because BME's claims had any merit. As a result, the Warrant Purchase Agreement between YAG and BME contained no representations by YAG regarding the exercisability of the YAG Warrant and, indeed, such representation was specifically stricken by YAG and Yorkville in the drafting process.

28.     Despite the conclusions and representations by YAG and Yorkville that the adjustment mechanism in the YAG Warrant was not applicable, on February 14, 2012, YAG sold the YAG Warrant to BME for a mere $2,575, which was an infinitesimal fraction (0.0057) of what YAG Warrant would be worth if it was exercisable at the $0.0099 price of the PGC shares issued to Crescent pursuant to Section 5(c) of the Crescent Debenture.

29.     Thus, at the time YAG and Yorkville sold the YAG Warrant to BME: YAG and Yorkville knew that the adjustment mechanism in the Warrant did not apply; knew that the Warrant could not be exercised and had no value other than the value of threatening PGC with unnecessary litigation costs and expenses; and knew that the sale of the Warrant to BME would result in litigation by BME against PCG and the unnecessary expenditure of litigation expenses by PGC in unnecessarily having to defend against such claims.

30.     In addition, prior to purchasing the YAG Warrant from YAG, BME also contacted PGC and was informed by PGC that the adjustment mechanism in the YAG Warrant was not applicable, and did not apply, to the shares issued to Crescent at $0.0099 per share.

31.     Given the representations to BME by YAG, Yorkville and PGC that the adjustment mechanism in the YAG Warrant did not apply, BME knew that the Warrant could not be exercised and had no value other than the value of threatening PGC with unnecessary litigation costs and expenses. Indeed, shortly after filing its Complaint against PGC in this action, BME repeatedly contacted PGC stating that PGC should settle with BME in order to avoid the litigation expenses, and not because BME's claims had any merit.

### FIRST CAUSE OF ACTION
### (Declaratory Relief Against BME Regarding The YAG Warrant)

32.     PGC repeats and realleges the allegations set forth in paragraphs 1-31 above as if set forth at length herein.

33.     BME, as successor in interest to YAG, has sought to exercise the YAG Warrant on an adjusted exercise price based solely on the issuance of shares to Crescent under the original terms of the Crescent Debenture.

34.     Pursuant to the plain language of Paragraph 5 of the YAG Letter Agreement, issuances of shares to Crescent upon the original terms of the Crescent Debenture, which were negotiated and consented to by YAG, were deemed Excluded Securities under the YAG Warrant and, thus, would not operate to adjust or reduce the exercise price of the YAG Warrant.

35.     Accordingly, BME's alleged adjustment to the exercise price in the YAG Warrant is invalid and, as the actual exercise price in the YAG Warrant is, and has always been, above the market price of PGC's shares, the YAG Warrant is not exercisable and, pursuant to its terms and conditions, has expired.

### SECOND CAUSE OF ACTION
### (Violation of New Jersey's Frivolous Litigation
### Statute, N.J.S.A. 2A:15-59.1, Against BME)

36.     PGC repeats and realleges the allegations set forth in paragraphs 1-35 above as if

set forth at length herein.

37. As YAG's successor in interest to the YAG Warrant, BME knew or should have known that YAG agreed in the YAG Letter Agreement that the issuance of shares under and pursuant to the Crescent Debenture would be deemed "Excluded Securities" under the YAG Warrant.

38. Upon information and belief, BME was provided with a copy of the YAG Letter Agreement and the Crescent Debenture. Indeed, both documents were filed by PGC with the Securities and Exchange Commission and were, therefore, public record.

39. Moreover, on or about February 14, 2012, the day that BME purchased the YAG Warrant, BME was informed by YAG's Investment Manager, Portfolio Manager and agent, Yorkville, that the "adjustment mechanism in the warrants is not applicable." BME had also been informed by PGC that the adjustment mechanism was not applicable.

40. Thus, BME purchased the YAG Warrant with knowledge that the claims that BME is pursuing in its Complaint are without merit and frivolous, and are being vexatiously pursued by plaintiff solely to impose litigation costs on defendant to pressure defendant to settle with plaintiff solely to avoid such costs and not because plaintiff's claims have any merit.

### THIRD CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing Under The YAG Warrant and SPA Against YAG, Yorkville and BME)

41. PGC repeats and realleges the allegations set forth in paragraphs 1-40 above as if set forth at length herein.

42. The YAG Warrant and the SPA both contain an implied covenant of good faith and fair dealing.

43. Pursuant to the covenant of good faith and fair dealing, YAG and its agent, Yorkville, had an obligation to not to take any action that would frustrate, destroy or deny PGC

of benefits of the bargain under the SPA and the YAG Warrant.

44. By selling and assigning its rights under the YAG Warrant to BME, knowing that the price adjustment did not apply and that the YAG Warrant could not be exercised in good faith, and knowing that BME would, in bad faith, institute this legal action against PGC causing injury and damages to PGC, YAG and Yorkville intentionally breached the covenant of good faith and fair dealing under the SPA and the YAG Warrant and, thereby, denied and destroyed the benefit of the bargain for PGC, and have, thus, breached the terms of the YAG Warrant and SPA. As YAG's agent, Yorkville intentionally engaged in such breach for YAG.

45. BME, through its purchase of the YAG Warrant, became subject to the covenant of good faith and fair dealing under the YAG Warrant and the SPA.

46. Pursuant to the covenant of good faith and fair dealing, BME had an obligation to exercise its rights under the YAG Warrant and the SPA in good faith, and in a manner so as not to destroy the benefits of the bargain made by PGC.

47. By intentionally demanding an illegitimate adjustment to the YAG Warrant exercise price and seeking to exercise the YAG Warrant when it was not exercisable, BME has intentionally breached its covenant of good faith and fair dealing and has, thus, breached the terms of the YAG Warrant and SPA.

48. PGC has suffered damages resulting from such breaches, including, but not limited to, its legal fees and costs it has been forced to incur to defend this lawsuit and the adverse affect on its shareholders, the price of its common stock and PGC's market reputation.

**FOURTH CAUSE OF ACTION**
**(Indemnification Pursuant to Paragraph**
**Eight of the SPA Against YAG, Yorkville and BME)**

49. PGC repeats and realleges the allegations set forth in paragraphs 1-48 above as if set forth at length herein.

50.     Paragraph Eight of the SPA provides, in relevant part, that:

In consideration of the [PGC's] execution and delivery of this Agreement, and in addition to all of the Buyer's other obligations under this Agreement, the Buyer shall defend, protect, indemnify and hold harmless [PGC]…from and against any and all Indemnified Liabilities incurred by the Indemnities or any of them as a result of, or arising out of, or relating to…(b) any breach of any covenant, agreement or obligation of the Buyer(s) contained in this Agreement, the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby executed by the Buyer…

51.     By way of their breaches of the covenant of good faith and fair dealing, as set forth above, YAG, Yorkville and BME have breached the indemnification covenant in the SPA and in the YAG Warrant.

52.     PGC has suffered damages resulting from such breaches, including, but not limited to, its legal fees and costs it has been forced to incur to defend this lawsuit and the adverse affect on its shareholders, the price of its common stock and PGC's market reputation.

**FIFTH CAUSE OF ACTION**
**(Breach of Duty of Good Faith and Fair Dealing**
**Under The YAG Debenture And SPA Against YAG and Yorkville)**

53.     PGC repeats and realleges the allegations set forth in paragraphs 1-52 above as if set forth at length herein.

54.     As set forth above, between the issue date of February 26, 2007, and the maturity date of September 2, 2009, the YAG Debenture entitled YAG to obtain monthly repayment of the debenture through monthly installment conversions/redemptions of PGC stock.

55.     Such monthly conversions/redemptions were based upon, inter alia, eighty percent (80%) of the average of the two lowest volume weighted average prices of PGC's commons tock during the ten (10) consecutive trading days immediately preceding the installment date of the first of each month. As a result, under this formula, the *lower* the average of the two lowest volume weighted prices during the ten last trading days of each month, the

*more* stock YAG would receive under its redemption/conversion rights. It was, thus, in YAG's financial interests under the YAG Debenture for at least two trading days during the last trading days of each month to have exceptionally high volume and exceptionally low weighted average trading prices.

56. As a result of such conversions/redemptions, YAG received several million shares of PGC stock each month which it sold into the public markets on a regular basis as its means of being repaid and earning a profit on its investment in PGC through the YAG Debenture.

57. Upon information and belief, between February 2007 and September 2009, YAG, acting through its Investment Manager, Portfolio Manager and agent, Yorkville, specifically and intentionally timed YAG's sales of its PGC stock during the last ten (10) trading days of the month so as to have a significant *negative* impact on the average of the two lowest volume weighted average prices of PGC's commons stock during the ten last trading days of each month.

58. Upon information and belief, YAG and Yorkville Advisors did this intentionally, and in bad faith, in order to manipulate and drive the price of PGC's stock down on at least two of the last ten trading days of each month, by dumping a significant amount of stock on the market during those days. Upon information and belief, this was done specifically and intentionally to lower the price for the next month's conversion/redemption for YAG so that, through such manipulation, it would receive a much greater number of PGC shares than YAG was entitled to receive.

59. Yorkville Advisors conspired with, and aided and abetted, YAG in engaging in the foregoing breaches of the covenant of good faith and fair dealing.

60. As a result of the foregoing, YAG and Yorkville breached the covenant of good faith and fair dealing and has, thus, breached the terms of the YAG Debenture and SPA.

61. PGC has suffered damages resulting from YAG's and Yorkville's breach

including, but not limited to, the value of the excess stock that PGC was required to issue to YAG as a result of YAG and Yorkville manipulating the price of PGC stock during the last ten trading days of each month, the adverse affect on PGC's shareholders, the adverse effect on the price of PGC's common stock and PGC's market reputation.

## SIXTH CAUSE OF ACTION
### (Indemnification Pursuant to Paragraph Eight of the SPA as Against YAG and Yorkville)

62. PGC repeats and realleges the allegations set forth in paragraphs 1-61 above as if set forth at length herein.

63. As set forth above, Paragraph Eight of the SPA requires YAG to indemnify and hold harmless PGC for "any breach of any covenant, agreement or obligation of the Buyer(s) contained in this Agreement, the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby executed by the Buyer."

64. By way of its breach of the covenant of good faith and fair dealing as set forth in the Fifth Cause of Action, YAG and Yorkville breached a covenant in the SPA and in the YAG Debenture.

65. YAG and Yorkville Advisors are thus required, by Paragraph Eight of the SPA, to indemnify PGC and hold it harmless for said breach.

66. PGC has suffered damages resulting from YAG's and Yorkville's breach including, but not limited to, the value of the excess stock that PGC was required to issue to YAG as a result of YAG and Yorkville manipulating the price of PGC stock during the last ten trading days of each month, the adverse affect on PGC's shareholders, the adverse effect on the price of PGC's common stock, and to PGC's market reputation.

## SEVENTH CAUSE OF ACTION
### (Conspiracy to File a Frivolous Litigation as Against All Counter-Claim Defendants)

67. PGC repeats and realleges the allegations set forth in paragraphs 1-66 above as if

set forth at length herein.

68. Rillo, as Managing Director of Yorkville, knew that the adjustment mechanism in the YAG Warrant was not applicable, that the YAG Warrant was not exercisable and, thus, that the YAG Warrant was worthless and could not be legitimately asserted in this action.

69. Rillo, informed Baker that the adjustment mechanism in the YAG Warrant was not applicable and that PGC would oppose any attempt to exercise the YAG Warrant.

70. Despite Rillo's knowledge that the YAG Warrant was not exercisable, which knowledge he shared with Baker, Rillo (on behalf of Yorkville and YAG) sold the YAG Warrant to Baker (acting on behalf of BME) with the knowledge and understanding that Baker (through BME) would pursue this frivolous litigation against PGC in New Jersey in an effort to coerce and extort some value from PGC for the otherwise valueless YAG Warrant.

71. Accordingly, Rillo, Baker, YAG, Yorkville aided and abetted BME in filing this frivolous lawsuit, and combined and conspired among themselves and with BME for BME to file this meritless and frivolous lawsuit against PGC in violation of N.J.S.A. 2A:15-59.1.

**WHEREFORE**, PGC demands judgment against BME, YAG, Yorkville, Rillo and Baker:

A. Declaring that the YAG Warrant is not, and was not, exercisable and is now expired;

B. Awarding PGC its damages, including, but not limited to, its attorneys fees and costs of suit; and,

C. Granting PGC such other and further relief as this Court deems just and proper.

Dated: August 27, 2012

GREENBERG TRAURIG, LLP
200 Park Avenue, P.O. Box 677
Florham Park, NJ 07932-0677
(973) 360-7900

BY: /s/ *Roger B. Kaplan*
    ROGER B. KAPLAN, ESQ.
Attorneys for Defendant/Counterclaim
Plaintiff Pacific Gold Corp.

15