UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BLACK MOUNTAIN EQUITIES, INC.,** Plaintiff, v. **PACIFIC GOLD CORP.,** Defendant. | Civ. No. 2:12-CV-01285 (KM)(CLW) **MEMORANDUM OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

    The plaintiff, Black Mountain Equities, Inc. ("Black Mountain"), trades in distressed securities; it profits by discerning value that may have been overlooked by others. Black Mountain has purchased, at a steep discount, a Warrant to Purchase Common Stock (the "YAG Warrant"). It brings this action alleging that Pacific Gold Corp. ("Pacific Gold") has refused to deliver 44,509,090 shares of its publicly traded common stock pursuant to the YAG Warrant.[1] The dispute here is over the exercise price under the Warrant as of February 22, 2012. If, as Black Mountain contends, a certain price adjustment was triggered, then the exercise price was approximately a penny (actually $.0099) per share and the option was in the money, because the stock was then trading at a higher price. If, as Pacific Gold contends, the adjustment was not triggered, then the exercise price was much higher, the option was out of the money, and the YAG Warrant (now expired) was essentially worthless.

    According to Black Mountain, the YAG Warrant's price adjustment mechanism was triggered under a "most-favored-nation" arrangement[2] when

---

[1] So called because it was originally issued to Cornell Capital Partners LP, which became YA Global Investments LLC ("YAG"). Black Mountain has purchased the Warrant from YAG, as related below. Although not a party to the original negotiations, Black Mountain now stands in the shoes of YAG.

[2] That terminology is the Court's, not the parties'. Originally a feature of international trade relations, "most favored nation" has been extended by analogy to the domestic commercial context. *See* Bryan A. Garner, ed., *Black's Law Dictionary* 1105 (9th ed. 2009).

1

Pacific Gold issued shares to another investor, Crescent International, at $.0099 per share. The most-favored-nation clause, if applicable, entitled Black Mountain to exercise the YAG Warrant at the same price Crescent paid. Pacific Gold counters that another relevant agreement (specifically, the "October 5, 2007 Letter Agreement") provides that the Crescent transaction would not trigger the most-favored-nation adjustment, because that Agreement defines the Crescent securities as "Excluded Securities." If Pacific Gold's interpretation is correct, then Black Mountain was not entitled to exercise the YAG Warrant at the Crescent price.

Section 5 of the October 5, 2007 Letter Agreement, however, quickly leads us into an interpretive morass. Carelessly drafted, it does not parse as a proper English sentence, and neither party contends that it can mean precisely what it says. Black Mountain says that Section 5's reference to "Excluded Securities" is artifactual, a mere scrivener's error, and that the Court should simply excise the reference. Pacific Gold's interpretation, on the other hand, requires the Court to interpolate the word "includes" into Section 5. This case seems to pit the brackets against the ellipses.

At this early stage, the matter is before the Court on Plaintiff's motion for an affirmative preliminary injunction directing Pacific Gold to deliver 44,509,090 shares of stock to Black Mountain. I have reviewed the parties' submissions, and I heard oral argument on October 22, 2012. For the reasons set forth below, the Court is not persuaded that Black Mountain has met its burden of showing a likelihood of success on the merits and irreparable harm. Plaintiff's motion for a preliminary injunction will therefore be **DENIED**.

### I. BACKGROUND

Pacific Gold, a corporation and citizen of the State of Nevada, owns certain mining claims, property, and leases in Nevada and Colorado. Plaintiff Black Mountain, a California corporation and citizen, invests in startup companies and distressed equity opportunities. The amount in controversy concededly exceeds $75,000. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332, the diversity statute. Venue is proper in the District of New Jersey under 28 U.S.C. § 1391, because the YAG Warrant contains a forum selection clause and Pacific Gold has made no attempt to show that the clause is invalid or unreasonable. *See Cadapult Graphic Sys., Inc. v. Tektronix, Inc.*, 98 F. Supp. 2d 560, 564 (D.N.J. 2000). The parties have agreed that New Jersey law governs the interpretation of the YAG Warrant. (YAG Warrant §14, Hudders Cert. Ex. A, ECF No. 21-1.)

a. <u>The YAG Warrant</u>

Pacific Gold wanted to raise capital. Therefore, on February 26, 2007, Pacific Gold entered into a Securities Purchase Agreement by which it sold convertible debentures and a warrant to purchase shares to Cornell Capital Partners LP. (Cornell is now known as YA Global Investments L.P. ("YAG").) Pursuant to that Agreement, Pacific Gold issued the YAG Warrant to Purchase Common Stock, a five-year contract that expired on February 26, 2012. Under the terms of the YAG Warrant, YAG could exercise an option to obtain up to 6 million shares of Pacific Gold at a then-current exercise price of $0.216 per share. That exercise price, however, was subject to adjustment. Section 8 of the YAG Warrant provided that, if Pacific Gold should issue other shares at a lower price, then the exercise price under the YAG Warrant would be adjusted downward to match. That "most-favored-nation" arrangement appears to have been designed to protect YAG against dilution of the Warrant's value. The price adjustment would *not* be triggered, however, by the issuance of defined "Excluded Securities." [3] Thus the YAG Warrant provides, in relevant part:

> If and whenever the Company issues or sells, or is deemed to have issued or sold, any shares of Common Stock (**other than Excluded Securities**) for a consideration per share less than a price (the "Applicable Price") equal to the Warrant Exercise Price in effect immediately prior to such issuance or sale, then immediately after such issue or sale the Warrant Exercise Price then in effect shall be reduced to an amount equal to such consideration per share. Upon each such adjustment of the Warrant Exercise Price hereunder, the number of Warrant Shares issuable upon exercise of this Warrant shall be adjusted to the number of shares determined by multiplying the Warrant Exercise Price in effect immediately prior to such adjustment by the number of Warrant Shares issuable upon exercise of this Warrant immediately prior to such adjustment and dividing the product thereof by the Warrant Exercise Price resulting from such adjustment.

YAG Warrant § 8(a) (emphasis added).

It is undisputed that a third party, Crescent International, subsequently exercised certain conversion rights and that YAG issued common stock to Crescent at an average price of $.0099 per share. Pacific Gold says that these

---

[3] The YAG Warrant § 1(b)(vi) defines "Excluded Securities." The definition more pertinent to the outcome of this case, however, is contained in the October 5, 2007 Letter Agreement, as discussed below.

Crescent shares were "Excluded Securities"; Black Mountain says they were not. On that issue depends the applicability of the downward price adjustment under the YAG Warrant. A description of the transaction with Crescent follows.

### b. The Crescent Transaction and October 5, 2007 Letter Agreement

In October 2007, Pacific Gold entered into a financing transaction with Crescent International. The structure of the Crescent transaction was similar to that of the earlier YAG transaction. Like the YAG transaction, the Crescent transaction encompassed convertible debentures and a common stock warrant. Pacific Gold's ability to enter this financing transaction with Crescent, however, was contingent upon YAG's consent. Accordingly, Pacific Gold and YAG entered into a side letter agreement (the "October 5, 2007 Letter Agreement," Hudders Cert. Ex. E, ECF No. 21-5). In the October 5, 2007 Letter Agreement, YAG

  i. consented to the Crescent transaction;
 ii. agreed that the conversion price under the Crescent Debentures of $.18 per share would adjust YAG's exercise price under the YAG Warrant downward to $.18 per share; and
iii. in Section 3, agreed that the Crescent transaction, unless the terms were changed in the future, would not cause any further adjustment in the conversion rate of the YAG Debentures.

The October 5, 2007 Letter Agreement also contains the defectively drafted Section 5, here reprinted in its entirety:

> The Company and YA Global agree that for the purposes of the YA Global Warrant, the definition of "Excluded Securities" the issuance of shares of Common Stock on conversion of the Crescent Debenture and exercise of the Crescent Warrant upon the terms as originally issued on the date hereof provided the terms are not changed after the date hereof will not cause any adjustment in the conversion rate of the YAG Debentures.[4]

October 5, 2007 Letter Agreement, § 5. Section 5 is discussed more fully below.

Section 9 of the October 5, 2007 Letter Agreement is also relevant to the analysis. It provides:

---

[4] The parties appear to agree that Section 5, although it refers to "YAG Debentures," was intended to encompass the exercise of the YAG Warrant. The reference to YAG Debentures in Section 3 of the Agreement, by contrast (see paragraph iii, immediately above), appears to reflect the intent of the parties.

4

> For the purposes of this agreement, if the Crescent Debenture conversion rate or the Crescent Warrant exercise price is adjusted then the exercise price of the YAG Warrant . . . shall [] be adjusted pursuant to section 8 . . ., and the fixed conversion price of the YAG Debenture, if it is not paid in full, will be adjusted pursuant to Section 5(a) of the YAG Debenture to the extent such adjustment is below the exercise or conversion price of the YAG Debenture or Warrants.

*Id.*, Section 9.

The Crescent Debenture, like the YAG Warrant, has a "most-favored-nation" price adjustment mechanism. Under Section 5(c) of the Crescent Debenture, Crescent was entitled to a one-time-only price adjustment based upon the average conversion price, under the *YAG* Debenture, for the last three redemption issuances to YAG in the ensuing ten month period. (Landeau Cert. ¶ 10, ECF No. 20.) Those last three redemption issuances to YAG occurred in July and August 2008, at an average price of $.0099. (*Id.*) Thus the conversion price under the Crescent Debenture was likewise adjusted to $.0099. (*Id.*) In late 2008 and early 2009, Pacific Gold issued approximately 8,080,000 shares to Crescent at the adjusted price of $.0099 per share. (Fleming Dec. Ex. 12, ECF No. 15-3.)[5]

### c. Black Mountain's Exercise Notice

On February 14, 2012, twelve days before the YAG Warrant expired, Black Mountain purchased the Warrant from YAG for $2,575.00. On February 22, 2012, Black Mountain attempted to exercise the YAG Warrant at a price of $.0099 per share. That exercise price was based on the most-favored-nation adjustment in the October 5, 2007 Letter Agreement. In its Exercise Notice, Black Mountain alluded to the basis for the price: the "change of the [Crescent] conversion price [to $.0099] causes an adjustment to the [YAG] warrant exercise price and warrant quantity." (Exercise Notice, Baker Decl. Ex. 8, ECF No. 14-9.) The next day, by letter dated February 23, 2012, Pacific Gold rejected Black Mountain's attempt to exercise the Warrant at $.0099 per share. In that letter, Pacific Gold stated that the adjusted price for the conversion and

---

[5] Pacific Gold contends that, because of interlocking provisions, YAG's own conversion price triggered a reduction of the Crescent conversion price to $.0099, and that Black Mountain (as YAG's successor) now relies upon that very reduction to trigger a reduction of the YAG Warrant exercise price. Whether that is circular or not, it does not necessarily bear upon the proper interpretation of the agreements here; if the parties contracted for a hall of mirrors, then that is what they should get.

5

issuance of shares pursuant to the Crescent Debenture did not trigger a commensurate price adjustment under the YAG Warrant.

Hence this action.

## II. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (numbering added); *accord American Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). "It has often been observed that the purpose of the preliminary injunction is the preservation of the status quo and that an injunction may not issue if it would disturb the status quo." 11A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2948 at 133-34 (2d ed. 1995). That observation, however frequent, probably goes too far. Nevertheless, the courts have applied heightened scrutiny to applications for

> (1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits.

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 978 (10th Cir. 2004), *aff'd on other grounds*, 546 U.S. 418 (2006). *See also Acierno v. New Castle County*, 40 F.3d 645, 647, 653 (3d Cir. 1994) ("A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered. A mandatory preliminary injunction compelling issuance of a building permit fundamentally alters the status quo.")

The preliminary injunction sought here would not restore or preserve any status that ever existed as between these parties; nor would it merely "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenish*, 451 U.S. 390, 395 (1981). Rather, it would fundamentally alter the relations of the parties and would be tantamount to final judgment in plaintiff's favor. When a plaintiff seeks mandatory preliminary injunctive relief that so changes the status quo, it bears "a particularly heavy burden." *Acierno*, 40 F.3d at 653.

## III. DISCUSSION

### 1. Likelihood of Success of the Merits

The first preliminary injunction factor requires the applicant to show that it is likely to prevail at the ultimate trial on the merits. *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990); *see also* Wright & Miller, Federal Practice and Procedure, § 2948 (while "courts use a bewildering variety of formulations of the need for showing some likelihood of success . . . [a]ll courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.") Failure to establish a likelihood of success on the merits, even standing alone, is fatal to an application for a preliminary injunction. *American Express*, 669 F.3d at 366, 374. Specifically, Black Mountain must establish that it was entitled to exercise the YAG Warrant on February 22, 2012, at $.0099 per share and, upon that exercise, to receive approximately 44.5 million shares of Pacific Gold common stock. To resolve that merits inquiry this Court must interpret the YAG Warrant and the October 5, 2007 Letter Agreement.

Black Mountain argues that the clear and unambiguous terms of the YAG Warrant and October 5, 2007 Letter Agreement establish that an adjustment to the YAG Warrant exercise price was triggered when, in 2008-09, Pacific Gold issued approximately 8 million shares to Crescent, pursuant to the Crescent debenture, at $.0099 per share. (Plaintiff's Mem. at 8-9, ECF No. 16.) The Court agrees that, under the most-favored-nation provision of the YAG Warrant, the exercise price will be adjusted if Pacific Gold "issues . . . any shares of common stock . . . for less than a price . . . equal to the [YAG] Warrant exercise price." (*Id.* at 9.) Further, it is undisputed that Pacific Gold did indeed issue shares of common stock to Crescent for less than the YAG Warrant exercise price.

That does not, however, end the inquiry. The Court must still consider the October 5, 2007 Letter Agreement, which is far from clear.

As to Section 9 of the October 5, 2007 Letter Agreement (quoted above), Black Mountain's argument is straightforward: Section 9 requires an adjustment to the YAG Warrant exercise price "if the Crescent Debenture conversion rate ... is adjusted." As noted above, the Crescent Debenture conversion rate was indeed adjusted to $.0099. Black Mountain contends that it is therefore entitled to the same $.0099 price that Crescent got. Pacific Gold has a narrower interpretation of Section 9, but it depends in part upon the delimitation of Section 5; hence I will first discuss Section 5.

Pacific Gold stresses that what Section 9 of the October 5, 2007 Agreement appears to give, Section 5 can take away. It contends that the shares issued to Crescent at $.0099 are "Excluded Securities" under Section 5

7

of the October 5, 2007 Letter Agreement. If so, says Pacific Gold, then the issuance of those shares to Crescent would not trigger the adjustment of the YAG Warrant exercise price. As noted, however, the drafting of Section 5 (quoted in full above) is highly flawed as a matter of syntax and grammar.

Black Mountain proposes to eliminate the "Excluded Securities" issue by arguing that any such language in Section 5 is a "remnant from an earlier draft, not intended to have any effect." (Plaintiff's Reply Mem. at 7, ECF No. 23.) For this point, Black Mountain relies on the certification of Andrew Hudders, Esq. – a certification, by the way, filed in *opposition* to Black Mountain's motion. Mr. Hudders represented Pacific Gold in both the YAG and Crescent financing transactions, and he speaks from personal knowledge. (Hudders Cert. ¶¶ 2, 5, ECF No. 21.) His certification attaches emails and prior drafts of the October 5, 2007 Letter Agreement that he exchanged with YA Global's in-house counsel, David Fine, Esq. According to Black Mountain, those emails and drafts, by which Sections 3 and 5 developed into their final form, establish that the parties intended to drop the reference to "Excluded Securities" from Section 5. (Plaintiff's Reply Mem. at 7, ECF No. 23.) (Black Mountain itself, of course, was not involved in the 2007 negotiation; it arrived on the scene much later, when it purchased the YAG Warrant in 2012.)

It does appear that, in earlier drafts, Sections 3 and 5 of the October 5, 2007 Letter Agreement were parallel, and that they contained parallel "Excluded Securities" language. (*See* Hudders Cert. Ex. G.) It is also clear that an earlier reference to "Excluded Securities" was struck from the final version of Section 3. But Black Mountain ventures into conjecture when it concludes that the failure *also* to strike the reference to "Excluded Securities" from Section 5 must therefore have been a clerical error. To some degree, Black Mountain's contentions depend on David Fine's intentions when he was negotiating on behalf of YA Global. But Black Mountain does not submit a supporting declaration from Mr. Fine. Rather, Black Mountain relies on a declaration from Troy Rillo, a Senior Managing Director at Yorkville Advisors, LLC, which was YA Gobal's investment manager. (ECF No. 24.) Mr. Rillo states that the language of the October 5, 2007 Letter Agreement "makes crystal clear that any adjustment to the conversion rate of the Crescent Convertible Note or the exercise price of the Crescent Warrant, for whatever reason, will result in a corresponding adjustment to the YA Global Warrant." (Rillo Decl. ¶ 5, ECF No. 24.) Mr. Rillo claims to possess "personal knowledge regarding YA Global's investment in Pacific Gold," and no doubt he does; it does not appear, however, that Rillo was specifically involved in the drafting of the October 5, 2007 Letter Agreement. His interpretation of the agreement may represent his sincere opinion (Pacific Gold is skeptical even of this, *see infra*), but it is not competent, first-hand factual testimony.

In short, Black Mountain – which has the burden of proof – proposes an interpretation of Section 5 that is within the realm of possibility, but it does not clearly establish a likelihood of success on the merits.

To be sure, Pacific Gold's argument that the Crescent shares are "Excluded Securities" under Section 5 is not free of difficulties either. Pacific Gold makes the awkward proposal that the Court salvage Section 5 by inserting the word "includes," as follows:

> The Company and YA Global agree that for the purposes of the YA Global Warrant, the definition of "Excluded Securities" [***includes***] the issuance of shares of Common Stock on conversion of the Crescent Debenture and exercise of the Crescent Warrant upon the terms as originally issued on the date hereof provided the terms are not changed after the date hereof will not cause any adjustment in the conversion rate of the YAG Debentures.

The subject of the alleged sentence ("definition") is now paired with a verb ("includes"), and that represents a grammatical improvement. Pacific Gold's particular word choice, however, is not dictated by grammar; why interpolate "includes" if, for example, "does not include" makes just as much syntactical sense?

The answer, says Pacific Gold, is in the negotiation history of the October 5, 2007 Letter Agreement. In cases of ambiguity, a court applying New Jersey law "may look to extrinsic evidence as an aid to interpretation." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 948 A.2d 1285, 1289 (2008). Indeed, even when an agreement is integrated and seemingly clear, evidence of the circumstances is admissible in aid of interpretation. *Conway v. 287 Corporate Ctr. Assocs.*, 187 N.J. 259, 901 A.2d 341, 347 (2006).

> This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety, and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance....

9

*Atl. N. Airlines, Inc. v. Schwimmer*, 12 N.J. 293, 96 A.2d 652, 656 (1953). *A fortiori*, when *both* parties acknowledge that the writing must be reformed or reinterpreted, it is permissible to examine their expectations as expressed in the negotiations.

The first draft of the October 5, 2007 Agreement provided that "the definition of 'Excluded Securities' will include hereafter shares of Common Stock of the Company issued or to be issued on conversion of the Crescent Debenture and exercise of the Crescent Warrant upon the terms as originally issued on the date hereof." (Hudders Cert. Ex. L.)[6] David Fine, in-house counsel for YAG, reviewed and revised that draft. Fine's initial revisions left intact the reference to "Excluded Securities" in Sections 3 and 5, but added the following language to the end: "provided the terms are not changed after the date hereof." (*Id.* Ex. G.) According to Pacific Gold, those emailed revisions demonstrate that Fine (and therefore YAG) never intended to disturb Section 5's definition of "Excluded Shares," which includes shares issued under the Crescent Debenture "upon the terms as originally issued on the date hereof."

Less than 24 hours later, David Fine sent an email expressing "second thoughts" about Sections 3 and 5. (*Id.*, Ex. H.) That email expressed a concern "that there can be an event that may not be captured by our anti-dilution sections but trigger an adjustment under Crescents. I think it is fair that we both be treated the same going forward." (*Id.*) According to Pacific Gold, Fine was here conveying his belief that Section 5 adequately covered the existing situation, but that he remained concerned with the unpredictable: "an event that may not be captured" by the current language; the relationship "going forward."

Pacific Gold argues that Mr. Fine therefore inserted additional language into Sections 3 and 5 to allow for the possibility of any *new* adjustments that might arise or be negotiated in the future. After an additional exchange of emails, at 4:28 p.m. on October 4, 2007, Fine circulated a revised draft that, for the first time, inserted Section 9. (*Id.*, Ex. I.)[7] (*Id.*) This, says Pacific Gold, was part and parcel of Fine's concern with *new* adjustments, *i.e.*, adjustments not pursuant to the documents in their current form.

Black Mountain argues that, even assuming that the "excluded securities" reference in Section 5 was not just a drafting mistake, the sweeping

---

[6] As quoted by Hudders, the draft contains some question-begging ellipses. Why elide "hereafter," for example, and what did "hereafter" mean, anyway?

[7] This draft is redlined to highlight changes; confusingly, however, significant intervening changes to Section 5 do *not* appear in the redline highlighting. The final clause ("will not cause any adjustment in the conversion rate of the YAG Debentures"), for example, appears for the first time in this draft, without explanation.

language of Section 9 would nullify it. But Pacific Gold's approach offers a way of reading Section 9 in conjunction with, not as a nullification of, Section 5. (Defendant's Mem. at 9-10, ECF No. 19.) *See* Restatement (Second) of Contracts § 203(a) (1979) ( "an interpretation which gives a reasonable, lawful and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63 (1995); *Washington Hosp. v. White,* 889 F.2d 1294, 1300 (3d Cir. 1980) ("goal of construing an agreement so as to give meaning to all of its words and phrases") (citing *Rossville Salvage Corp. v. W.E. Graham Co.,* 319 F.2d 391, 395 (3d Cir. 1963) (contract construction "which give effect and meaning to a term is to be preferred over one which makes such term mere surplusage or without effect")); *Porreca v. City of Millville,* 419 N.J. Super. 212, 233, 16 A.3d 1057, 1070 (App. Div. 2011) (contract should be read "as a whole" and "should not be interpreted to render one of its terms meaningless").

Accepting *arguendo* Pacific Gold's reading of Section 5, there would appear to be a neat division of labor between Sections 5 and 9: Section 5 establishes that shares subsequently issued pursuant to the *unchanged* terms of the Crescent Debenture and Warrant, *as those terms existed as of October 5, 2007,* are "Excluded Securities" under the YAG Warrant. (*Id.*) That is, Section 5 applies to adjustments "upon the terms as originally issued on the date hereof provided the terms **are not changed** after the date hereof." (Emphasis added.) Section 9, on the other hand, applies if and when the terms of the Crescent Transaction **are changed** in the future. Put another way, Section 9's application is limited to any subsequently negotiated adjustments to the Crescent conversion price.

It must be said that Pacific Gold's limitation of the scope of Section 9 is not explicit in the text. And Pacific Gold's position, like that of Black Mountain, depends on a disputed interpretation of Section 5. Only if Pacific Gold's interpretation of Section 5 is correct does its complementary interpretation of Section 9 make sense as the other side of the coin. In short, Pacific Gold's argument regarding the interpretation of Sections 5 and 9 is plausible, but hardly watertight. Of course, it is not Pacific Gold that seeks a preliminary injunction, and Pacific Gold does not have the burden of proof.

The Court is presented with competing certifications submitted by the parties who did not seek an evidentiary hearing. Under either side's interpretation, it is clear that a drafting error occurred and that additional facts (and perhaps additional discovery) will be necessary to establish the intent of the contracting parties. In this respect, Black Mountain is at a practical disadvantage, because it is YAG's, not Black Mountain's, contractual intent that is relevant. On that score, Pacific Gold proffers some powerful circumstantial evidence that Black Mountain would have to overcome.

For example, the parties' performance sheds light on how they themselves believed the contract should be interpreted. Restatement (Second) of Contracts § 202;[8] *see Langer v. Monarch Life Ins. Co.,* 879 F.2d 75, 81 (3d Cir. 1989) (when writing is ambiguous, course of performance is relevant to determination of parties' intent); *State Troopers Fraternal Ass'n of N.J., Inc. v. State,* 149 N.J. 38, 692 A.2d 519, 524-25 (1997) (citation omitted) (court reforms contract based on party's continuing practice of making retroactive pay adjustments not explicitly provided for in agreement); *Rod v. Gidley,* 2009 WL 3488456 at *5 (N.J. Super. Ct., App. Div. 2009) (not precedential) ("Where a course of performance is inconsistent with the language of the agreement, which one party claims to be erroneous, a court may look to the course of performance to determine the parties' intent and understanding and construe and reform the agreement to accord with the course of performance").

Black Mountain seeks to assert rights for which YAG allegedly bargained. But YAG itself, before selling the Warrant to Black Mountain, exercised the warrant on numerous occasions, and never sought an adjustment based on the $.0099 Crescent price. (Landau Cert. ¶¶ 11-12 & Ex. B, ECF No. 20.) Approximately monthly, from June 2007 until September 2009, YAG exercised its conversion rights under its Debenture to acquire millions of shares of Pacific Gold stock at prices ranging from $.18 down to $.0052. Surely at some point YAG would have asserted its rights if it believed the YAG Warrant was in the money at a price of $.0099.[9] Moreover, in February 2012, YAG sold its Warrant to Black Mountain for a mere $2,575.00. If Black Mountain's interpretation is

---

[8]   That section of the Restatement provides:

   * * *

   (4) Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

   (5) Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade.

[9]   Black Mountain presses an inference that, because Pacific Gold did not make SEC filings in the relevant period, YAG did not know that Crescent had exercised its conversion rights at $.0099. That inference is hardly inescapable. YAG knew, for example, of the terms of the Crescent transaction. And, if Black Mountain's interpretation of the October 5, 2007 Agreement is correct, then YAG possessed a vital interest in finding out whether, and at what price, Crescent had exercised its conversion rights.

correct, the option was then worth hundreds of thousands of dollars. That YAG (which negotiated the terms of the Warrant) was willing to sell it at such an extraordinary discount suggests that YAG did not believe or intend that the option was exercisable for $.0099.

Indeed, emails suggest that, just before the sale, YAG specifically warned Black Mountain that the Warrant was out of the money. (Kaplan Cert. Ex. D, ECF No. 22.) Just a few hours prior to the closing of the Warrant Purchase Agreement between Black Mountain and YAG, Tony Rillo of YAG told Adam Baker (President of Black Mountain) that YAG first needed to "evaluate the warrant" to determine if it was "in the money" before agreeing to sell it. (*Id.*) A few hours later, Rillo advised Baker that the "adjustment mechanism in the warrants is not applicable." (*Id.*) This is the same Tony Rillo whose certification, submitted by Black Mountain, now states that it is "crystal clear" that the YAG Warrant adjusted to $.0099 and was in the money. Rillo's initial position may be explained away as risk-shifting to the buyer; nevertheless, it substantially undercuts his subsequent position.

It is a fact-intensive inquiry whether the Crescent issuance at $.0099 per share fell within the definition of "Excluded Securities," or whether, on the contrary, it triggered a price adjustment under the YAG Warrant. On this record, the Court cannot conclude that Black Mountain has demonstrated a sufficient likelihood of success on the merits. *See L.Y. ex rel. J.Y. v. Bayonne Bd. of Educ.*, CIV. A. 09-4422 SRC, 2009 WL 2998153 (D.N.J. Sept. 15, 2009) *aff'd*, 384 F. App'x 58 (3d Cir. 2010) (denying preliminary injunction based on fact-intensive merits inquiry where Plaintiff failed to demonstrate a likelihood of success on the merits). For this reason alone, I would deny a preliminary injunction.

### 2. Irreparable Harm

In addition, and in the alternative, Black Mountain has failed to demonstrate that it will suffer irreparable harm if the injunction does not issue.

Harm is considered "irreparable" if it is not redressable by money damages at a later date, in the ordinary course of litigation. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1964)).

Economic loss does not constitute irreparable harm....

[I]n order to warrant a preliminary injunction, the injury created by a failure to issue the requested injunction must "'be of a peculiar nature, so that compensation in money cannot atone for it....'" *A.O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (3d Cir.1976)

> (quoting *Gause v. Perkins*, 3 Jones Eq. 177, 69 Am. Dec. 728 (1857)). The word irreparable connotes "'that which cannot be repaired, retrieved, put down again, atoned for....'" *Id.* (quoting *Gause*, 3 Jones Eq. 177, 69 Am. Dec. 728).

*Acierno,* 40 F.3d at 653.

In a contract action, it therefore naturally follows that irreparability is closely tied to the question of whether the plaintiff is confined to the legal remedy of damages, or may instead be entitled to the equitable remedy of specific performance. Black Mountain does not dispute that specific performance is generally not available in a suit for the delivery of shares of a publicly traded stock. *See Buford v. Wilmington Trust Co.*, 841 F.2d 51, 55 (3d Cir. 1988) (specific performance inappropriate in action for failure to deliver shares of publicly traded stock where the shares do not carry with them unique characteristics such as corporate control); *Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) (finding "simply no reason why, assuming a jury finds IBM liable for breach of contract, money damages would not adequately compensate [plaintiff] for IBM's breach" of contract to deliver publicly-traded shares upon exercise of stock option) (citing *Simon v. Electrospace Corp.*, 269 N.E.2d 21, 26 (N.Y. 1971) (noting that specific performance is not appropriate where the claim involves publicly traded stock)); *Dimock v. U.S. Nat. Bank*, 55 N.J.L. 296, 304-05 (E.&A. 1893). Rather, damages are an adequate and appropriate remedy for failure to deliver shares that are available on the open market. *See generally* 12A Fletcher Cyc. Corp. § 5631 ("If the seller of stock refuses or fails to perform in accordance with the contract, the purchaser may maintain an action for damages against that person with whom the contract was made.") This action is about money; by definition damages would make plaintiff whole, if it prevailed.

Black Mountain makes a distinct claim, however. It alleges that preliminary injunctive relief is necessary to preserve any damages remedy to which it may ultimately be entitled. The irreparable harm, according to Black Mountain, is that Pacific Gold is or may become insolvent, rendering a money judgment uncollectable. (Plaintiff's Mem. at 10, ECF No. 16) ("Black Mountain will suffer irreparable harm because PCFG is unlikely to be able to satisfy any ultimate damages award at the end of the case.")

The Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), while not precisely on point, suggests that preliminary injunctive relief would be inappropriate. There, plaintiffs had sought a preliminary injunction restraining Grupo Mexicano from transferring assets. Plaintiffs alleged that Grupo Mexicano was at risk of insolvency, or already insolvent; that it was planning preferential transfers of

its most valuable assets to its Mexican creditors; and that these actions would frustrate any judgment plaintiffs could obtain. *Id.* at 312-13. The Supreme Court held that a plaintiff who sued for breach of contract seeking damages, a remedy at law, could not obtain a preliminary injunction against the assets of a debtor against whom it had no judgment. *Id.* at 332-33.

To be sure, *Grupo Mexicano* makes it clear that when a plaintiff asserts equitable claims, as opposed to legal claims for damages, the rule barring issuance of a preliminary injunction freezing assets does not apply. *See id.* at 324–25 (distinguishing *Deckert v. Independence Shares Corp.,* 311 U.S. 282 (1940), and noting that in *Deckert* "the preliminary injunction 'was a reasonable measure to preserve the status quo pending a final determination of the questions raised by the [equitable] bill' "). *Grupo Mexicano* does not prohibit the issuance of preliminary injunctions in an action for equitable relief.

This action, however, is not properly viewed as one in equity. True, Black Mountain seeks to compel delivery of shares. Nevertheless, even if Black Mountain prevailed on its breach of contract claim, its sole remedy would be money damages, not specific performance. *See supra.* In this case, then, a preliminary injunction is not required to preserve the Court's ability to award final equitable relief, because no such relief would be appropriate. *See Ortho Pharm. Corp. v. Amgen, Inc.,* 882 F.2d 806, 813-14 (3d Cir. 1989) ("[T]he most compelling reason in favor of ... [issuing a preliminary injunction] is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act. . . . Consequently, the preliminary injunction is appropriate whenever the policy of preserving the court's power to decide the case effectively outweighs the risk of imposing an interim restraint before it has done so.") (quoting Wright & Miller, Federal Practice and Procedure, § 2947 at 424 (1973)).

Black Mountain's preliminary injunction motion, although couched in equitable terms, is more properly viewed as an attempt to secure a money judgment to which it may someday be entitled. The shares at issue are not unique in kind, quality, or personal association; they are not the stuff of a decree in equity. *Compare, e.g., U.S. v. Jenkins,* 714 F. Supp. 2d 1213 (S.D. Ga. 2008) (harming Native American artifacts constitutes an irreparable injury for purposes of determining whether to grant a preliminary injunction; artifacts are, by their nature, unique, and their historical and cultural significance make them difficult to value monetarily); *Universal Engraving, Inc. v. Duarte,* 519 F. Supp. 2d 1140, 1149 (D. Kan. 2007) (no amount of monetary damages could restore the confidentiality of proprietary information, and the harm from

disclosure of trade secrets would be irreparable); *Beerheide v. Zavaras*, 997 F. Supp. 1405, 1410 (D. Colo. 1998) (Orthodox Jewish prisoners seeking an injunction to compel a prison to serve them kosher food, satisfied the irreparable injury requirement because damages would not compensate them or remedy the deprivation of their free exercise rights). The only harm Black Mountain alleges is that assets might not be available to satisfy what must, as a matter of law, be a money judgment and no more.

If concern for a defendant's solvency were sufficient grounds for an injunction, "it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence." *Grupo Mexicano*, 527 U.S. at 327 (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 222-23 (1945)).

Black Mountain cites unreported New York federal cases that awarded relief like that sought by Black Mountain here. *See, e.g., Alpha Capital Anstat v. Advanced Cell Technology, Inc.*, S.D.N.Y. 09 Civ. 670 (LAK) (S.D.N.Y. Feb. 10, 2009); *Alpha Capital Anstat v. Advanced Cell Technology, Inc.*, S.D.N.Y. 11 Civ. 6458 (PAC) (S.D.N.Y. Oct. 14, 2011*); Alpha Capital Aktiengesellschaft v. Advanced Viral Research*, No. 02 CV 10237 (GBD), 2003 WL 328302, at *5 (S.D.N.Y. Feb. 11, 2003)*; Longview Special Finance v. Infinium Labs, Inc.*, 06 Civ. 1772 (RJH) (Nov. 29, 2006); *Castle Creek Technology Partners, LLC v. CellPoint Inc.*, No. 02 Civ. 6662 (GEL), 2002 WL 31958696, at *3 (S.D.N.Y. Dec. 9, 2002). A number of these cases were decided before *Grupo Mexicano*, and none of them mention *Grupo Mexicano*. Black Mountain also relies on a pre-*Grupo Mexicano* case from the Third Circuit, *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 205-06 (3d Cir. 1990) for the proposition that a preliminary injunction can be authorized in "extraordinary circumstances" to secure a money judgment where defendant would be insolvent. *Hoxworth* is distinguishable because it involved a defendant who was dissipating or secreting assets, an equitable concern not present here. *Id.* at 193. More fundamentally, though, *Hoxworth* must be applied with caution in light of the subsequent *Grupo Mexicano* decision. *See generally U.S. v. Tann*, 577 F.3d 533, 542 (3d Cir. 2009) ("we 'should not countenance the continued application in this circuit of a rule, even of our own devising, which is patently inconsistent with the Supreme Court's pronouncements'") (quoting *Cox v. Dravo Corp.*, 517 F.2d 620, 627 (3d Cir. 1975)). In fact the Second Circuit decision reversed by

*Grupo Mexicano* relied on *Hoxworth* in the same manner that Black Mountain does here. *See Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 143 F.3d 688, 695 (2d Cir. 1998) (citing *Hoxworth* for the proposition that "a preliminary injunction is available to protect the plaintiff's right to recover monetary damages when there is a threat that the defendant will become insolvent or dissipate assets"). The Supreme Court, reversing, expressly disagreed with the Second Circuit on that very point. *Grupo Mexicano*, 527 U.S. at 332-33. In light of *Grupo Mexicano*, the Court is not persuaded by the cases cited by Pacific Gold.[10]

No preliminary injunction may issue where a plaintiff has failed to demonstrate likelihood of success on the merits and irreparable harm. *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987) (holding that the absence of both or either is fatal to a motion for preliminary injunction); *accord American Express Travel Related Servs.*, 669 F.3d at 366 (applicant must show both a likelihood of success and irreparable injury). Thus the Court will refrain from examining the remaining factors, *i.e.*, the balance of harms and the public interest. The extraordinary and limited remedy of a preliminary injunction is not warranted.

---

[10] Even if I were to accept that the prospect of a defendant's insolvency may constitute irreparable harm, I would not necessarily find that the requisite showing has been made here. The Supreme Court has stressed that a plaintiff seeking "preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original); s*ee also Nissen v. Rozsa*, 2009 WL 2391244 (D.N.J. Aug. 4, 2009) ("speculation as to unsatisfiability of the judgment or potential dissipation of assets in the absence of any facts supporting such a claim is insufficient to meet its burden to demonstrate irreparable harm") (citing *Grupo Mexicano*, 527 U.S. at 327-30.)

Black Mountain asserts that Pacific Gold is insolvent because Pacific Gold's most recent balance sheet lists assets totaling $1,821,184 and liabilities of $4,704,767. (Fleming Decl. Ex. 10 at F-2, p. 29 of 66, ECF No. 15.) Pacific Gold counters that its balance sheet does not capture its true financial position, because it reflects only the historical cost of assets less depreciation, not a current fair market valuation. (Defendant's Mem. at 25, ECF No. 19.) A judgment for plaintiff, while substantial, is estimated to be in the hundreds of thousands of dollars. (*See* Baker Decl. ¶ 16, ECF No. 14)(stating that the 44.5 million shares of Pacific Gold "had a market value far in excess of $500,000" at the time of Black Mountain's exercise notice). Black Mountain's claim that Pacific Gold lacks the cash or assets to satisfy such a judgment is, at best, in need of further factual development.

## IV. CONCLUSION

For the foregoing reasons, the motion of the Plaintiff, Black Mountain Equities, Inc., for a preliminary injunction will be **DENIED**. An appropriate form of order will be filed.

_____
KEVIN MCNULTY, U.S.D.J.

Dated: November 27, 2012